643 A.2d 156

William P. DAMICO

v.

ZONING BOARD OF ADJUSTMENT OF the CITY OF PITTSBURGH and Sotel, Inc.

William P. DAMICO

v.

CITY OF PITTSBURGH and The City Council of the City of Pittsburgh, and Sotel, Inc.

William P. DAMICO

v.

ZONING BOARD OF ADJUSTMENT OF the CITY OF PITTSBURGH and City of Pittsburgh and Sotel, Inc.

Appeal of William P. DAMICO, Appellant.

Commonwealth Court of Pennsylvania.

Argued Nov. 16, 1993.

Decided May 31, 1994.

396

Scott D. Cessar, for appellant.

J. Russell McGregor, Jr., Asst. City Sol., for appellee, City of Pittsburgh.

John D. Eddy, for appellee, Sotel, Inc.

Before COLINS and FRIEDMAN, JJ, and RODGERS, Senior Judge.

FRIEDMAN, Judge.

William P. Damico appeals from two orders of the Court of Common Pleas of Allegheny County affirming the grant of variances to Sotel, Inc. by the Zoning Board of Adjustment of the City of Pittsburgh (Zoning Board): the first order affirmed the Zoning Board's grant of a variance for side and front yard setbacks and parking in connection with the construction of a restaurant on Sotel's property; the second order affirmed the Zoning Board's grant of a variance for the addition of a rear deck awning on that restaurant. Damico also appeals a third order of the trial court upholding the conditional use approval granted by the Council of the City of Pittsburgh (City Council) to Sotel for the same property.

Damico has owned and operated a restaurant (Cliffside) on Grandview Avenue in the Mount Washington section of Pittsburgh for approximately 20 years. To the immediate left of Damico's restaurant, as one faces its front door, was a 40 foot by 100 foot parcel of land which Sotel acquired in 1988 as a site for a restaurant. Because the property was zoned S–A Special District under the Zoning Ordinance of the City of Pittsburgh, Code of Ordinances, Title IX (Zoning Ordinance), Sotel was required to obtain conditional use approval for its

proposed development of the property.[1]  Thus, on March 25, 1988, Sotel submitted an Application for Approval of a Conditional Use,[2] requesting the grant of a conditional use to Sotel for the construction of a two story restaurant at 1210–1212 Grandview Avenue.  (R.R. at 11–13.)  At a public hearing held on December 13, 1988, the Planning Commission heard from supporters of the proposal as well as from Damico, who expressed his concern that Sotel's planned building would interfere with the view of Downtown Pittsburgh from the Cliffside and exacerbate parking problems in the area.  Following a continued hearing, the Planning Commission voted to recommend approval of the conditional use on January 13, 1989.  The Planning Commission relayed notice of its action to City Council by transmitting a resolution approving Sotel's conditional use for enactment by City Council, along with a copy of the Planning Commission's report and recommendation.  The notice did not include minutes of the Planning Commission hearings, but informed City Council that these were on file in the Office of the Zoning Administrator in the Department of City Planning.  (R.R. at 21–30.)  Damico did not receive a copy of the report nor was he notified of the City Council meeting to act on Sotel's conditional use application. The Director of the Planning Department presented the resolution before City Council, and on February 7, 1989, City Council finally approved the conditional use without taking testimony or receiving evidence and without making any inde-

1.  The regulations of the S–A Special District are intended to permit and encourage special development suitable and appropriate to certain portions of the City having unique location and natural site advantage in relation to major business, cultural and recreational areas.  (Zoning Ordinance § 925.01.)  To this end, in the S–A Special District, land and structures may be used, and structures may be erected, altered or enlarged, only for specifically enumerated use exceptions; a restaurant is one of these authorized conditional uses.  (Zoning Ordinance §§ 925.02 and 925.03(a)(12).)

2.  Pursuant to section 993.01(a) of the Zoning Ordinance, such applications are filed with the Department of City Planning of the City of Pittsburgh (Planning Department).  Subsequent to the filing, the Planning Commission holds public hearings and, after hearings, reports its findings and recommendations to City Council which makes the final decision to approve or reject the application.

pendent findings of fact or conclusions of law. Damico appealed.

On October 13, 1988, while its application for a conditional use was still pending, Sotel filed an Application for Occupancy and/or Building Permit with the Office of Zoning Administration to construct the restaurant; however, the Zoning Administrator disapproved the permit because Sotel's proposed plans violated front yard, side yard, parking and loading requirements of Pittsburgh's (City) Zoning Ordinance. Sotel then appealed to the Zoning Board, requesting variances from the requirements applicable to restaurant uses in the S–A District. Following a hearing, at which Damico testified that granting the side yard variance would result in a building which would impair the view from his restaurant, the Zoning Board, on December 19, 1988, granted Sotel the front yard, side yard, parking and loading variances,[3] noting that the variances related only to the construction of the building and that the occupancy of the structure for a restaurant remained dependent upon City Council's grant of the conditional use. Damico appealed.

Following the grant of the variances and the conditional use approval, but while Damico's two appeals were pending, Sotel constructed the restaurant, which opened in January 1990. On April 16, 1991, Sotel filed an Application for an Occupancy and/or Building Permit to add an awning over the top roof deck of the restaurant. When the Zoning Administrator disapproved the application because construction of the awning violated Zoning Ordinance requirements, Sotel appealed to the Zoning Board and requested a variance to allow the addition of the awning. The Zoning Board held a hearing on Sotel's request and on January 10, 1992, granted Sotel this variance. Damico appealed.

3. The Zoning Board granted the following variances: the front yard setback reduced from 30' to 0'; the side yard setbacks reduced from 15' and 15' to 3'8" and 3'8"; parking located within 1,000' instead of on property; and loading dock not provided, subject to the condition that loading and unloading be limited to weekdays between 7:00 and 10:00 a.m. Damico does not contest the loading variance.

On December 17, 1992, the trial court issued separate orders affirming City Council's grant of the conditional use, affirming the Zoning Board's grant of the front yard, side yard, parking and loading variances, and affirming the Zoning Board's grant of a variance for the construction of the awning.[4] On January 15, 1993, Damico appealed to this court from these three orders.

On appeal,[5] Damico contends that (1) City Council improperly and unlawfully granted Sotel's request for a conditional use; and (2) the Zoning Board abused its discretion or committed legal error in granting the front yard, side yard and parking variances and in granting a variance for the construction of an awning to Sotel.

### THE CONDITIONAL USE APPROVAL

Damico argues that City Council's grant of the conditional use was both procedurally defective and substantively wrong. As to the procedural question, Damico notes that Local Agency Law governs City Council's grant of a conditional use, *North Point Breeze Coalition v. City of Pittsburgh,* 60 Pa.Commonwealth Ct. 298, 431 A.2d 398 (1981), and contends that City Council's adjudication here failed to comply with Local Agency Law requirements or fundamental due process. We disagree.

4. Damico had also appealed from the Zoning Board's grant of a variance to Sotel allowing him to construct an enclosure on the rear roof deck, which the trial court reversed. Sotel appeals to this court from that order in a separate action.

5. Where the trial court has taken no additional evidence, our scope of review is limited to determining whether the Zoning Board and/or City Council committed a manifest abuse of discretion or an error of law in granting the variances and/or conditional use approval. *Searles v. Zoning Hearing Board, City of Easton,* 118 Pa.Commonwealth Ct. 453, 545 A.2d 476 (1988). Abuse of discretion exists only when the agency's findings of fact are not supported by substantial evidence of record. *Pittsburgh Trust v. Zoning Board of Adjustment of the City of Pittsburgh,* 145 Pa.Commonwealth Ct. 503, 604 A.2d 298 (1992). Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983).

Damico supports his position by citing sections 553, 554 and 555 of the Local Agency Law, 2 Pa.C.S. §§ 553, 554 and 555. These sections provide as follows:

§ 553. **Hearing and Record.**

No adjudication of a local agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard. All testimony may be stenographically recorded and a full and complete record may be kept of the proceedings. In the event all testimony is not stenographically recorded and a full and complete record of the proceedings is not provided by the local agency, such testimony shall be stenographically recorded and a full and complete record of the proceedings shall be kept at the request of any party agreeing to pay the costs thereof.

2 Pa.C.S. § 553.

§ 554. **Evidence and cross-examination.**

Local agencies shall not be bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be received. Reasonable examination and cross-examination shall be *permitted.*

2 Pa.C.S. § 554. (Emphasis added.)

§ 555. **Contents and service of adjudications.**

All adjudications of a local agency shall be in writing, shall contain findings and reasons for the adjudication, and shall be served upon all parties or their counsel personally or by mail.

2 Pa.C.S. § 555.

Based on these sections, Damico asserts that the grant of Sotel's conditional use is invalid. First, Damico claims that, in violation of sections 553 and 554, neither the Planning Commission nor City Council ever held a full and complete hearing on Sotel's conditional use application. Damico complains that the Planning Commission did not permit examination and cross-examination of witnesses as required; further, Damico objects because City Council conducted no hearing of its own and approved Sotel's application after considering only the

Planning Commission's report and recommendation, without the benefit of the minutes from the Planning Commission meeting. Damico also contends that the grant of the conditional use was procedurally marred because, in violation of section 555, he never received a copy of the Planning Commission's report, he was not notified that City Council would be considering the report at its meeting, and he was never sent a copy of the resolution approving the conditional use. All of Damico's procedural arguments must fail.

■ With regard to Damico's first argument, section 993.01(a)(C) of the Zoning Ordinance sets forth the procedure for review of conditional use applications. This procedure, in subsection (2), includes specific provisions for notice and public hearing to satisfy Local Agency Law requirements of "reasonable notice" and "an opportunity to be heard." [6] Indeed, here Damico attended the December 13, 1988 hearing and testified before the Planning Commission; nevertheless, Damico complains that he was not afforded an adequate opportunity to be heard at the meeting before the Planning Commission. Maintaining that a "hearing" requires the taking of testimony under oath and an opportunity for examination and cross-examination of witnesses, Damico contends that the Planning Commission meeting, at which interested but unsworn persons simply stated their views regarding the proposed restaurant, fell short of the requirement. We cannot agree that the

6. Section 993.01(a)(C)(2) of the Zoning Ordinance provides:

(2) **Notice and Public Hearing.** Subsequent to the filing of an application for a conditional use, a public hearing shall be held by not less than three members of the Commission on such application. Notice of the time, place and purpose of such hearing shall be given by the Department at least fifteen days prior thereto by the following methods:

a. By at least ten printed or typewritten handbills, posted in conspicuous places upon the concerned site ...;

b. By mailing of notification to the owners, ... of all property within 150 feet of the concerned site;

c. By mailing a notice thereof to every association of residents or owners who have registered an association name with the Department for this purpose, and

d. By mailing of notification to the official secretary or clerk of any other political subdivision that is within 150 feet of the concerned tract.

Planning Commission failed to comply with Local Agency Law or that it denied Damico due process.

We note that section 554 of the Local Agency Law permits, but does not require, examination and cross-examination during agency hearings. Here, at the December 13, 1988 hearing, Damico never requested permission to examine or cross-examine witnesses. Moreover, at the conclusion of that hearing, the Planning Commission chairman announced that the public hearing would be continued at a second meeting of the Planning Commission, at which time the Planning Commission would actually take action on Sotel's conditional use application. (R.R. at 49.) Although Damico might have requested permission to present witnesses or cross-examine prior witnesses at that time, he failed even to attend the Planning Commission's subsequent meeting, held on January 10, 1989. Under these circumstances, we conclude that the Planning Commission procedures afforded Damico the requisite notice and opportunity to be heard with regard to the conditional use approval; the fact that Damico did not make full use of that opportunity does not make it inadequate. *See Riojas v. Board of Licenses and Inspections Review of the City of Philadelphia,* 26 Pa.Commonwealth Ct. 625, 364 A.2d 986 (1976). (Board of Licenses and Inspections Review, although having authority to compel attendance of witnesses at hearing before it, had no affirmative duty to produce any witness absent a specific request.)

■ Damico also maintains that City Council failed to provide a proper hearing on Sotel's conditional use application because it did not hold its own hearing on the matter but, rather, based its approval solely on the Planning Commission's report and recommendation. Damico contends that because City Council did not consider the minutes from the Planning Commission meeting, it lacked knowledge of or information regarding the objections that Damico made at that meeting. Sections 993.01(a)(C)(3) and (4) of the Zoning Ordinance provide that the Planning Commission conduct public hearings and report its *findings* and *recommendation* to City Council for final action on a conditional use application. Damico does

not challenge the ability of City Council to delegate its fact-finding duties to the Planning Commission, a practice condoned in *Nernberg v. City of Pittsburgh*, 153 Pa.Commonwealth Ct. 219, 620 A.2d 692 (1993), citing *Delaware Valley Convalescent Center, Inc. v. Beal*, 34 Pa.Commonwealth Ct. 177, 382 A.2d 1290 (1978), *aff'd*, 488 Pa. 292, 412 A.2d 514 (1980), but asserts that, as a logical consequence of *Nernberg*, if City Council makes this delegation, the Planning Commission must fully and accurately apprise City Council of its fact-finding before City Council finally approves or disapproves a conditional use application. Again, we must disagree with Damico's argument.

Initially, we note that section 553 of the Local Agency Law, 2 Pa.C.S. § 553, provides that "All testimony *may* be stenographically recorded and a full and complete record *may* be kept of the proceedings." (Emphasis added.) Clearly, if the Planning Commission is not required even to keep a full and complete record of its hearing, then logically, the validity of the City Council's approval cannot depend on inclusion of that record in the Planning Commission's report and recommendation. *See Phillippi v. School District of Springfield Township*, 28 Pa.Commonwealth Ct. 185, 367 A.2d 1133 (1977).[7] Further, while we would not argue that the Planning Commission's report could have been presented to City Council more competently, we have reviewed the record and conclude that the report provides findings and reasons which are supported by substantial evidence and sufficient to meet the standards for conditional use approval found in section 993.01(a)(D) of the Zoning Ordinance.[8]

7. In this case, the Planning Commission kept a stenographic record of the hearings. However, in the event the local agency declines to keep a full and complete record, a stenographic record of the proceedings must be kept at the request of any party agreeing to pay for it. 2 Pa.C.S. § 553.

8. This section of the Zoning Ordinance provides:

D. Standards: No conditional use shall be recommended for approval if any of the following findings is made.

(1) That the establishment, maintenance, location and operation of the proposed use will be detrimental to or endanger the public health, safety, morals, comfort or general welfare; and

Finally, Damico contends that, in violation of section 555 of the Local Agency Law, 2 Pa.C.S., he did not receive necessary information connected with the conditional use application. In keeping with Local Agency Law requirements, section 993.01(C)(3) of the Zoning Ordinance, provides that a copy of the Planning Commission's findings and recommendations shall be sent to *City Council and the applicant.* That same section also provides that notification of these findings and recommendations shall be forwarded to interested parties when a written request for that information has been filed with the Commission. Because there is no indication that Damico filed such a request, he cannot complain that he did not receive them. Moreover, the fact that Damico never received a copy of the City Council resolution would, at most, be harmless error where he has filed a timely appeal from that determination.

In addition to his procedural arguments, Damico also contends that City Council's grant of the conditional use was substantively wrong because he provided sound bases for denying the conditional use pursuant to § 993.01(D)(2) of the Zoning Ordinance; i.e., Damico's objections that construction of the proposed structure would interfere with the view from the Cliffside and exacerbate existing parking problems.[9] Again, we disagree.

> (2) That the proposed use will be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes permitted, nor substantially diminish or impair property values within the neighborhood; and
>
> (3) That the establishment of the proposed use will impede the normal and orderly development and improvement of surrounding property for uses permitted in that district; and
>
> (4) That adequate utilities, access roads, drainage and other necessary facilities have not been or will not be provided; and
>
> (5) That adequate measures have not been or will not be taken to provide ingress and egress designated so as to minimize traffic congestion in the public streets; and
>
> (6) That the proposed use will not, in all other respects, conform to the applicable regulations or the district in which it is located.

9. Damico's testimony in opposition to the grant of the conditional use was as follows:

> I'm in opposition. . . . I'm not opposed to a restaurant in that site but I am opposed to the building they're going to put in. It's going to

■ A review of the Planning Commission's report and recommendation indicates that the Planning Commission considered both the restaurant's impact on area parking and its effect on the value of adjacent properties. The report to City Council specifically stated that Sotel had made arrangements to provide the parking places required for a restaurant of the size proposed, (Planning Commission Finding of Fact, No. 6; R.R. at 27), and, in fact, conditioned the grant of the conditional use on Sotel's providing evidence of a parking agreement. (R.R. at 29.) Further, the Planning Commission found that the Board "reviewed the impact of the sideyard variances on the adjacent properties and determined that property values would not be substantially diminished or impaired as a result of the variances." (Planning Commission Finding of Fact, No. 8(2); R.R. at 27.) With regard to S–A Districts, City Council, in order to fulfill the purposes of an S–A District designation, has wide latitude to approve a conditional use even when the proposed use does not strictly conform to Zoning Ordinance requirements. Section 925.03 of the Zoning Ordinance. We cannot say that it abused its discretion in doing so here.

### THE ZONING VARIANCES

A. Dimensional variances.

■ Under section 993.01(a)(27)(e) of the Zoning Ordinance, restaurants in an S–A District are required to have a front or rear yard depth of 30′ and side yard widths of 15′ when not abutting a street. Here Sotel sought, and the Zoning Board

degrade my view.... My view starts at 51 feet from the sidewalk. Their building is going to go out 57 feet from the sidewalk. So, it's going to lower the value of my property, degrade my restaurant and I'm opposed.
As far as the parking is concerned, there's five licenses involved. There's a total of between 1300 and 1400 chairs on Grandview Avenue. If you use the City yardstick of 63 chairs for 25 spaces, we come up with a deficit of about 240 parking spaces right now. If you go up there at two o'clock in the morning, the lot is empty, three o'clock in the morning. But for full use, it can't accommodate everybody up there. Now that's without the three restaurants that are planned in the Trimont plan. When they start operating, Lord knows what we're going to do up there.
(R.R. at 47–48.)

granted, variances entitling Sotel to construct its restaurant with a 0' front yard setback and sideyard setbacks of 3'8" each.

■ The standards governing the Zoning Board's grant of a variance are found at section 25057 of the Second Class Cities Code, 53 Pa.S. § 25057, and section 909.05 of the Zoning Ordinance. These provisions generally require the party seeking a variance to prove that, owing to special circumstances or conditions unique to the property, strict application of the ordinance would result in unnecessary hardship,[10] depriving him of the reasonable use of his property. In addition, the party must establish that the requested variance is for a use permitted in the district, that it is the minimum needed to afford relief, that it requires the least modification of the regulation from which the variance is sought and that it will not be contrary to the public interest.[11] The reasons for

10. Actually, the phrase used in section 909.05 of the Zoning Ordinance is "where strict application would result in *practical difficulty or* unnecessary hardship." However, the only one of these terms used in section 25057 of the Second Class Cities Code is "unnecessary hardship."

11. In pertinent part, section 909.05 of the Zoning Ordinance specifically provides:

909.05 VARIANCES.
(a) [T]he Board shall have the power to vary or adjust the strict application of the requirements of this Zoning Ordinance for only a use permitted in the district where the lot is located, in the case of an exceptionally irregular, narrow, shallow or steep lot or other exceptional physical condition not provided for in the district regulations or as a special exception, where strict application would result in practical difficulty or unnecessary hardship that would deprive the owner of the reasonable use of the land or structures involved, but in no other case. No variance in the strict application of any provisions of this Zoning Ordinance shall be granted by the Board unless it finds:
(1) That there are special circumstances or conditions, fully described in the findings of the Board, applying to the land or structure for which the variance is sought, which circumstances or conditions:
A. Are peculiar to such land or structure and do not apply generally to land or structures in the neighborhood, and have not resulted from any act of the appellant or his predecessors in title subsequent to the adoption of this Zoning Ordinance, whether in violation of the provisions hereof or not; and

granting a variance must be substantial, serious and compelling. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983).

Following a hearing, the Zoning Board stated, with regard to hardship:

Hardship was argued based on the fact that providing required side yard setbacks of fifteen (15') feet each on a lot which is forty (40') feet wide would result in a structure approximately ten (10') feet wide. It was argued that the width of the structure is necessary to provide for access of service, a side entrance and refuse accommodations. It was further argued that a structure less than thirty (32') feet eight (8") inches in width was considered. The proposed width was recommended by the DCP [Department of City Planning].

(Zoning Board Findings of Fact; R.R. at 118.) In addition, the Zoning Board found, *inter alia,* that Sotel's proposed front yard setback was consistent with the setback of other structures along the street, and that the side yard setbacks provide for fire access and maintenance of the structure. Moreover, the Zoning Board found that Sotel's proposal would act to complete development in an area where one (1) vacant lot had existed and, in doing so, would complement other restaurants in the neighborhood. Based on its findings, the Zoning Board granted Sotel's requested variances, concluding that the variances were "minimal in nature" and that Sotel had satisfied

B. Are such that strict application of the provisions of this Zoning Ordinance would deprive the appellant of the reasonable use of such land or structure;

(2) That the variance to be granted by the Board is:

A. For a use permitted in the district;

B. One that will require the least modification of the prescribed regulation; and

C. The minimum variance that will accomplish this purpose; and

(3) That the granting of the variance shall:

A. Be in harmony with the general purposes and intent of Section 901.06;

B. Be in accordance with the general or specific rules herein contained; and

C. Be not injurious to the neighborhoods, or otherwise detrimental to the welfare of the people at large.

the heavy burden set forth in *Valley View* by proving (1) that unnecessary hardship would result if the variance were denied and (2) that the proposed use would not be contrary to the public interest. *Id.*

In opposition to the Zoning Board's grant of the dimensional variances, Damico argues that Sotel failed to produce evidence sufficient to meet his burden of proof. Specifically, Damico contends that Sotel did not adequately demonstrate that failure to grant the variances would result in unnecessary hardship; that is, that strict conformity with the zoning regulation would deprive him of the reasonable use of his land, or that the requested variances were the minimum departures from the Zoning Ordinance necessary to accommodate a permitted use in the district. Thus, Damico asserts that the Zoning Board, by failing to follow prescribed standards, abused its discretion in granting these variances to Sotel. We disagree.

Remaining cognizant of the standards governing the grant of variances and having closely examined the evidence upon which the Zoning Board based its decision, we are satisfied that the Zoning Board reasonably concluded that Sotel proved entitlement to the requested variances. Initially, Sotel demonstrated that strict enforcement of the zoning regulations would result in unnecessary hardship by preventing construction of any building on the lot. Christopher Passodelis, a real estate developer and Sotel's financial consultant and advisor, testified that on Sotel's 40' wide lot, adherence to the required 15' sideyard setbacks would limit the width of a structure to only 10', thereby making it "impossible to build anything" on the property. (R.R. at 166.) [12] Passodelis also indicated that

12. The chairman of the Zoning Board obviously viewed this as evidence of undue hardship, as illustrated by his comment at the hearing. "As I see it, we have a 40–foot lot and the Code requires, in effect, 30 feet of the 40 feet to be set back 15 on each side which only leaves 10 feet. And for practical purposes, I don't know that you could even construct, literally, a closet with outside walls with 10 feet." (R.R. at 205.) *See also Hipwell Manufacturing Co. v. Zoning Board of Adjustment of the City of Pittsburgh,* 70 Pa.Commonwealth Ct. 83, 452 A.2d 605 (1982) (unnecessary hardship results where available building area without a variance is so small as to prevent the construction of any residence on the property).

with a side yard of 3'8″ on either side, comprising approximately 18–20 percent of the total lot size, the property would have the largest side yard of any building on the block, but that with the requested variances, "we could still build a structure that would be able to support itself and still abide by the recommendations of the [Planning Department.]" (R.R. at 167.)

With regard to whether the variances represented the minimum departure from the Zoning Ordinance to afford relief, Sotel's architect, Mr. Yucas, stated that the proposed building was "structured so that the variances requested are the minimum variances that would be required to have a practical structure on this lot." (R.R. at 167.) In fact, when questioned about whether any consideration had been given to designing a narrower building, Mr. Yucas indicated that he was originally operating on the assumption that the restaurant would encompass the lot's entire 40 feet, but that the Planning Department had expressed concerns over maintenance and fire egress if the structure were built with a zero side yard. Based on the Planning Department's determination that 3'8″ sideyards would be the best dimension to accommodate its concerns, Yucas stated that he was told to design the building to conform to that figure. (R.R. at 169.) Yucas testified that "it was tough but we were able to do it." (R.R. at 169.) [13]

Damico counters, claiming that Sotel's own witnesses testified that Sotel might have designed a building that required lesser variances but chose not to because a smaller building would not have satisfied Sotel's "program requirements." [14]

13. One of the compromises that Sotel had to make in order to conform to the Planning Department's insistence on 3'8″ of side yard space was to have a side entrance rather than a front entrance to the restaurant. As Passodelis explained, "at 32 feet you cannot put in the entrance in the front and still have the exit. There's just not room enough to be able to do everything." (R.R. at 189.)

14. To support this position, Damico points to the following testimony:
   Mr. Yucas: ... So, the bottom line answer to that is I don't think we could do a building smaller than this that would satisfy the owners' program requirements.
   Mr. Clair: Well, you're an architect.

Damico characterizes these "program requirements" as profit motives and, relying on *Hipwell Manufacturing Co. v. Zoning Board of Adjustment of the City of Pittsburgh,* 70 Pa.Commonwealth Ct. 83, 452 A.2d 605 (1982), Damico asserts that such "program requirements" do not legally justify the grant of a variance to Sotel. In *Hipwell,* a landowner was granted front and side yard variances to permit him to build a multiple dwelling consisting of ten units. We reversed, noting that the *only* record evidence in support of the variances was the general statement that they made the project economically feasible and produced an aesthetic that was in keeping with the neighborhood. We held that this was insufficient to meet the landowner's burden of showing unnecessary hardship because it failed to establish why the property could not be used for the construction of a multiple-dwelling of less than ten units. Damico claims that there is a striking parallel between this case and *Hipwell* because, here too, Sotel's *only* basis in support of its request for dimensional variances is the need to generate greater revenues. We believe that Damico's reliance on *Hipwell* is misplaced.

First, unlike the situation in *Hipwell,* where the landowner's builder conceded that economic reasons prompted the request for variances, here it is only Damico, not Sotel, that equates "program requirements" with "project economics." Indeed, far from its being the *only* reason for the requested variances, Sotel's witnesses never specifically mention economics as a reason for the variances at all. Moreover, in contrast to the landowner in *Hipwell,* who apparently had never considered constructing a smaller building, Sotel produced evidence of attempts to design a restaurant with lesser variances, all of

Mr. Yucas: Without going higher. There are always options. You can go down the hill farther or you can go higher into the sky.... (R.R. at 171–172.)

However, Damico failed to mention that Sotel could not avail itself of these options. (R.R. at 175.) In fact, Damico did not include the remainder of Mr. Yucas' statement, which continued as follows: "But keeping this footprint and keeping a two-story building and keeping the square footage restriction at 4300 square feet, which is another requirement that came out of the City Planning negotiations, this is pretty much the most efficient plan that we could derive." (R.R. at 172.)

which failed. Yucas indicated that he had produced and discarded as many as thirty drawings for the job; however, given the plot plan and the exterior constraints within which he had to work, the current proposal was the most efficient possible. (R.R. at 172–173.) [15]

With regard to the front yard variance, Damico asserts that the record is totally devoid of explanation relating to Sotels' need for any variance, much less evidence, as required, that Sotel's property would be rendered practically valueless without a total front yard variance. We disagree with Damico for several reasons.

First, to prevent any adverse appearance from the street, Sotel was constrained to align its restaurant with the other establishments on Grandview Avenue, (R.R. at 175), all of which have 0' front yard setbacks.[16] Moreover, it is obvious that the steep slope of the property made a 30' front yard setback prohibitive. The record indicates that Sotel's lot is 100' deep; however, it is on a hillside which begins to slope

15. Interestingly, during the hearing, Damico's counsel asserted that the premise upon which they always conducted their inquiry into this case was that Sotel's lot was not 40' wide but was actually slightly over 50' wide. (R.R. at 206.) Sotel's attorney produced a certified copy of a survey to the contrary. (R.R. at 211.)

16. In order to protect the views of the structures on either side, Sotel was also told not to go beyond the structure on either side of its proposed building. (R.R. at 175.) In fact, at a depth of 57', the back face of Sotel's restaurant is in line with the back face of the other buildings along the street. The deck that protrudes 13' from the rear of the building is a half story below Grandview Avenue because of the slope of the property at that point. (R.R. at 185.) A witness for Sotel testified that because the deck was below ground level, and thus below the level of any windows of the adjacent property, there would be no impairment of Damico's view. (R.R. at 219.) In this regard, we note that Damico's testimony concerning the negative impact of Sotel's restaurant on Cliffside's views was somewhat less than conclusive. (R.R. at 201, 214.)

Indeed, we are puzzled by Damico's objection to the 0' front yard setback. Damico complains that Sotel's restaurant detracts from Cliffside's view because of the 13' deck which extends past the Cliffside building. (R.R. at 201.) However, building Sotel's restaurant with a 30' front yard setback would only mean that it would extend back farther on the lot and impose on Cliffside's view to an even greater extent.

downward at approximately the halfway point. Thus, a front yard setback of 30' would require the bulk of the restaurant building to extend over the sloped portion of the property, requiring more extensive footers and foundations on the hillside of Grandview Avenue. Even if, technically, such construction were feasible, it would be prohibitively expensive. (R.R. at 188.)

Finally, we are not convinced that Sotel needed a variance in order to build its restaurant with a 0' front yard setback. Section 993.01(a)(27)(e) of the Zoning Ordinance requires that yards have a front *or* rear yard depth of 30'; it does not require front *and* rear yard depths of 30' each. Sotel's lot is 100' deep; if the proposed restaurant has a 0' front yard setback and is 57' deep with a 13' deck, for a total of 70', then by simple subtraction, we see that the property's rear yard must be 30', exactly what the Zoning Ordinance requires. In sum, because the record contains evidence sufficient to support its findings, we cannot conclude that the Zoning Board abused its discretion or committed an error of law in granting the dimensional variances to Sotel.

## B. Parking variance.

Under section 989.01 of the Zoning Ordinance, Sotel is required to provide 15 on-site parking spaces for the proposed restaurant.[17] Damico argues that Sotel presented no evidence at all regarding its need for a variance from that requirement and, thus, there was no basis for the Zoning Board to grant the variance.[18]

17. This section requires that there be one on-site parking space for every 125 square feet of floor area over 2,400 square feet. At 4,300 square feet, Sotel's restaurant is required to have 15 spaces.

18. In fact, Damico maintains that Sotel did not even request a parking variance. Although, on the appeal form, Sotel marked only those boxes indicating that it sought an area variance, (R.R. at 129), it is clear from the record that Sotel included the off-site parking variance in its appeal, (R.R. at 128), that the public was given notice of Sotel's intention to seek such a variance, (R.R. at 130), and that the Zoning Board considered the parking variance to be a subject of the appeal, (R.R. at 142).

■ On the other hand, Sotel claims that this variance, although granted, was not actually required. The trial court agreed with Sotel, noting that § 925.03 of the Zoning Ordinance states, in part, "... the amount of automobile parking and off-street loading facilities may be increased over or reduced from the requirements set forth in this Zoning Ordinance." Thus, the trial court reasoned that City Council, by enacting the conditional use, availed itself of the flexible parking requirements of an S–A District. We agree with the trial court's reasoning. As stated previously, the Planning Commission fully considered the impact that Sotel's restaurant would have on area parking and the alternate arrangements that Sotel made to provide the needed parking. The Planning Commission then recommended that Sotel be excused from the on-site parking requirements of the Zoning Ordinance and City Council approved; therefore, under section 925.03(a), no variance was required. In addition, we note that the Zoning Board's grant of the parking variance, if one was required, could not be construed as an abuse of discretion where limited lot size, even *without* the inclusion of 15 parking spaces, precluded construction unless variances were granted.

3. Awning variance.

■ Finally, with regard to the variance for construction of the awning, Damico claims that, as with the dimensional variances, Sotel failed to establish the requisite "unnecessary hardship." Damico asserts that Sotel can and, indeed, has been using the restaurant without the awning and seeks only to enhance profits by increasing use of the upper deck on windy and rainy days, a reason which cannot justify the grant of a variance. *M & M Sunoco v. Upper Makefield Township*, 154 Pa.Commonwealth Ct. 316, 623 A.2d 908 (1993).

Here, the trial court did not address Damico's argument, concluding that it need not consider whether Sotel proved that unnecessary hardship would result without the awning. Erection of the awning required the grant of variances reducing the required 15′ side yards to 3′8″ on either side. We agree with the trial court's reasoning that because the awning

structure, as proposed, did not exceed the side yard variances for the construction of the restaurant, variances which already had been granted by the Zoning Board and affirmed by the trial court, no further variance was required for installation of the awning; rather, the awning was reasonably included in the variances previously approved.

■ Damico disagrees, contending that because erection of the awning would create a third floor on the restaurant, the trial court erred by bootstrapping the awning variance to side yard variances premised on the construction of a two-story structure.[19] We cannot agree that by adding the awning, Sotel will create a three story restaurant. In section 903.02(s), the Zoning Ordinance defines "story" as *"that portion of a building included between the surface of any floor* and the surface of the next floor above it, or if there is no floor above it then the space between such floor *and the ceiling next above it;* not including cellar or basement." (Emphasis added.) We interpret this language to mean that a story of a building is that space included between and *enclosed within* one of the building's floors and the ceiling over that floor. Here, although the awning will provide covering for the deck, this covering will not act to bring the space beneath it within the confines of the restaurant building; instead, a diner on the unwalled deck remains outside the building. Thus, by merely placing an awning over the restaurant deck, Sotel will not add another "story", as that term is defined in the Zoning Ordinance.

## S–A SPECIAL DISTRICT STANDARDS

■ One final consideration is worth noting here. In *Hipwell,* we specifically noted that whereas the variances sought there were wholesome ones in civic terms, policy decisions connected to land use should be left to elected

---

**19.** However, because Damico argues that the side yard variance was erroneously granted, he obviously believes that the awning variance must fail even if it is premised on Sotel's entitlement to a side yard variance. We discussed the propriety of the grant of Sotel's requested side yard variances earlier in the dimensional variance portion of this opinion.

officials, with courts and zoning boards both compelled to support the sometimes doctrinaire standards for granting variances. *Id.* Again, in *Lipari v. Zoning Hearing Board of Easton,* 101 Pa.Commonwealth Ct. 302, 516 A.2d 110 (1986), we determined that despite the wholesome nature of a proposed project—to fill a need for housing for the elderly— neither the Zoning Hearing Board nor the trial court could allow the variances necessary to fit the project into the available property. We concluded that only the governing body of the municipality had the power and responsibility to embody in ordinance legislation the policy determinations involved in deciding where and how particular development should be placed. Based on the reasoning in *Hipwell* and *Lipari,* Damico argues that any alleged benefit to the Mount Washington community from Sotel's use of the property cannot act to lessen the strict standards required for the grant of a variance. We disagree; in fact, we believe that applying the rationale of *Hipwell* and *Lipari* to an S–A Special District does precisely that.

An S–A District, as its name indicates, is special, having as its intended goal the encouragement of development suitable to those portions of the City uniquely located in relation to major business, cultural and recreational areas. Section 925.01 of the Zoning Ordinance. To better achieve this objective, the Zoning Ordinance itself permits departure from strict adherence to zoning regulations in S–A Districts, section 925.03(a) of the Zoning Ordinance, and allows City Council, in granting a conditional use exception in an S–A Special District, to deviate from Zoning Ordinance requirements in order to advance the purpose of the S–A District. Section 925.03(a) specifically provides that:

> The following conditional uses and unit group buildings thereof are permitted after a public hearing and recommendation by the Commission, and after approval by Council in conformity with the provisions of Chapter 993. In approving any of the following uses, the height, size, bulk and design of structures, the size of yards, courts and other open spaces; the amount of lot area, and the amount of

automobile parking and off-street loading facilities may be increased over or *reduced from* the requirements set forth in this Zoning Ordinance, or may be fixed where no such requirements are set forth elsewhere in this Zoning Ordinance, so as to provide reasonable protection of site advantage and other amenities for surrounding properties, afford adequate light and air, and avoid undue concentration of population.

Thus, as described in *Hipwell* and *Lipari*, the City's governing body has expressed its policy determinations with regard to S–A Special Districts directly through its ordinance legislation and, where the S–A District would benefit from construction of a particular project, strict adherence to the Zoning Ordinance is achieved through a more flexible approach to Zoning Ordinance requirements for that construction.

Here, the Zoning Board, finding the variances "minimal in nature," granted Sotel's requested variances for construction of the restaurant, contingent on conditional use approval by City Council. In turn, when City Council granted the conditional use, it was aware that the development site was one of the few remaining vacant lots in the area and that Sotel's proposed development was consistent with both the Grandview Avenue Study and the Trimont Area Plan. City Council was also informed of all the dimensional reductions and other deviations from the Zoning Ordinance needed to develop the site as proposed, along with the Zoning Board's review of the impact of these changes on other property in the District. Thus, City Council's conditional use approval also included approval of the reduced yard dimensions and off-street parking pursuant to its authority under section 925.03(a) of the Zoning Ordinance.[20]

20. Damico argues that this reasoning is flawed because City Council relied on the variances granted by the Zoning Board when it granted the conditional use. However, it appears that City Council had authority under section 925.03(a) of the Zoning Ordinance to reduce dimensional requirements even without the Zoning Board's prior consideration of the variance standards. Thus, we cannot say that City Council erred in approving the plan proposed by Sotel when the Zoning Board, although not necessarily required to do so, also found the variances to be proper.

418

For all of the reasons expressed in this opinion, we affirm.

PELLEGRINI, J., did not participate in the decision in this case.

## ORDER

AND NOW, this 31st day of May, 1994, it is ordered as follows:

1. the order of the Court of Common Pleas of Allegheny County, dated December 17, 1992, in S.A. # 675–89, is affirmed;

2. the order of the Court of Common Pleas of Allegheny County, dated December 17, 1992, in S.A. # 146–89, is affirmed; and

3. the order of the Court of Common Pleas of Allegheny County, dated December 17, 1992, in S.A. # 389–92, is affirmed.