**SOCIETY HILL CIVIC ASSOCIATION and Richard Lush, Appellants**

v.

**PHILADELPHIA BOARD OF LI-CENSE & INSPECTION REVIEW, Philadelphia Historical Commission and P&A Associates.**

Commonwealth Court of Pennsylvania.

Argued June 5, 2006.

Decided July 27, 2006.

Reargument Denied Sept. 18, 2006.

---

Michael D. LiPuma, Philadelphia, for appellants.

Eleanor N. Ewing, Philadelphia, for appellee, City of Philadelphia.

Richard C. DeMarco, Philadelphia, for appellee, P&A Associates.

BEFORE: McGINLEY, Judge, SMITH–RIBNER, Judge, and FRIEDMAN, Judge.

OPINION BY Judge SMITH–RIBNER.

The Society Hill Civic Association and Richard Lush, a member of the Association's Zoning and Historic Preservation Committee, (collectively, Association), appeal from the order of the Court of Common Pleas of Philadelphia County affirming a decision of the Philadelphia Board of License and Inspection Review (Board), which upheld a decision of the Philadelphia Historical Commission (Commission). The Commission allowed P & A Associates (P & A) to reconstruct marble cornices with fiberglass on the façades of certain historically designated properties located in the Society Hill section of Philadelphia.

The Court is asked to decide whether this matter should be remanded to the Board for a new hearing due to the Board's violation of Section 705 of the Sunshine Act, 65 Pa.C.S. § 705, by failing to vote in public on its decision. The Court is also asked to decide whether the Board improperly permitted P & A to intervene in the appeal filed by the Association from the Commission's decision; whether the Association had standing to appeal; whether the unnecessary hardship exemption set forth in the City's Historical Preservation Ordinance (Preservation Ordinance) and the Commission's rules and regulations (Regulations) was properly applied; and whether the Board's decision is supported by substantial evidence.

## I

In 1995 P & A and Peter Shaw, a manager of the managing venture of St. James Associates Joint Venture, which owns historic townhouses located in the 700 block of Walnut Street, and a principal in the multi-million dollar project to develop a luxury high-rise residential tower to be known as "St. James Place" at the corner of Walnut and South 8th Streets, sought the Commission's approval of a proposal to make alterations to the historic townhouses. The townhouses, built in 1807 in the Society Hill section of Philadelphia and known as "York Row" (York Row townhouses), were included in the plan to construct the residential tower. On February 23, 1995, the Commission accepted the recommendations from its Architectural Committee and approved the proposed alterations in concept with the preservation and restoration of the York Row façades. The Commission stated that "[t]he facades shall be restored in situ and shall not be disassembled at any time." Commission's February 27, 1995 Letter; Reproduced Record (R.R.) at 73a.

In February 1999 P & A submitted a more detailed plan for the Commission's review in concept, proposing, *inter alia,* to substantially demolish the York Row townhouses at 700–718 Walnut Street to construct a forty-five-story residential high-rise tower containing 320 to 325 units. The Architectural Committee recommended approval of "[p]artial demolition of the rowhouses along Walnut Street with a retention and restoration to a depth of fifteen feet" and "[t]he proposed facade treatment for the new construction, with the lobby level windows raised to accentuate the first floor of the tower." Architectural Committee's February 23, 1999 Review in Concept, p. 4; R.R. at 76a. At its March 10, 1999 meeting, the Commission accepted the recommendation to approve the conceptual proposal, "with the construction of a clearly contemporary building ..., restoration of the dormers [windows projecting through the roof] on 712–716 Walnut Street, and the Restoration of the facade of 716 Walnut Street." R.R. at 77a.

In 2002 the Association submitted its complaints to P & A and to the Department of Licenses and Inspections regarding P & A's improper preservation of the façades of the York Row townhouses during its construction. On February 22, 2003, the carved marble cornices on the façades collapsed, fell to the ground and were destroyed. In August 2003 P & A sought approval to reconstruct the marble cornices of the townhouses in fiberglass. The Architectural Committee's staff noted that the collapse was due to demolition by neglect and recommended that the request be denied under the Secretary of the Interior's "Standards for the Treatment of Historic Properties" (Standards for Preservation) set forth in 36 C.F.R. § 68.3(a)(2) and (6).[1] R.R. at 88a. The staff also noted that ornate marble stoops and wrought iron railings were destroyed as well during the demolition but that they

---

1. The Standards for Preservation Nos. 2 and 6, 36 C.F.R. § 68.3(a)(2) and (6), provide:
   (2) The historic character of a property will be retained and preserved. The replacement of intact or repairable historic materials or alteration of features, spaces and spatial relationships that characterize a property will be avoided.
   . . . .

   (6) The existing condition of historic features will be evaluated to determine the appropriate level of intervention needed. *Where the severity of deterioration requires repair or limited replacement of a distinctive feature, the new material will match the old in composition, design, color and texture.* (Emphasis added.)

would be replicated in marble and iron. *Id.*

At a September 2003 Commission meeting, Peter Shaw stated that he proposed reconstruction of the marble cornices in fiberglass for economic reasons, noting that fiberglass would cost approximately $5000 to $6000 while marble would cost $100,000. Minutes of the Commission's September 12, 2003 meeting; R.R. at 108a. P & A's structural engineer hired after the collapse of the cornices, Nicholas Gianopulos, cited Independence Hall and the Wallace Building as examples of replication of cornices in fiberglass and stated that the existing gutters were inadequate for water conduction because of increased rain runoff from the high-rise building behind the façades. The Commission rejected the Architectural Committee's recommendation and unanimously approved reconstruction of the cornices in fiberglass. The Association appealed that decision to the Board.

At a hearing before the Board on January 6, 2004, the City questioned the Association's standing to appeal the Commission's decision. P & A filed a petition to intervene and a motion to quash the appeal for lack of standing in the Association. The Board decided to take the standing issues under advisement and proceeded to hear the witnesses' testimony. On February 12, 2004, the Board issued a written decision unanimously affirming the Commission's decision. The Board concluded that the Association and Lush had standing to appeal the Commission's decision, that P & A had standing to intervene in the appeal, that the Commission had substantial evidence upon which to base its decision and that the Commission made its decision in accordance with the law. It is undisputed that the Board members did not cast a vote on the appeal at the conclusion of the hearing and did not return for a public vote before issuing their written decision.

The Association appealed to the trial court, and the City filed a motion to quash for lack of standing, which was joined by P & A. The trial court denied the City's motion, concluding that the Association and its members had standing to appeal because they had a substantial, direct and immediate interest in preserving the historic attributes of Society Hill and that P & A had standing to intervene in the appeal. The court held that the Board as a quasi-judicial body is not subject to the Sunshine Act and that even if it were an agency subject to the Act its quasi-judicial deliberations would still be exempted from the public meeting requirement; that the Board's violation of the Act was harmless error; and that it was within the court's discretion to refuse to invalidate the decision. As for the merits, the court concluded that the Board's findings were supported by substantial evidence and stated that the Commission applied Section 14–2007 of the Philadelphia Code granting "exemption from the requirements of the historic preservation ordinance by a majority vote of the Commission in instances *where its literal enforcement would result in unnecessary hardship.*" Trial court December 2005 opinion at p. 4 (emphasis added).

II

The Association initially argues before the Court that this matter should be remanded to the Board for a new hearing because Board members failed to vote in public on their decision in violation of the Sunshine Act. The City asserts that the Board did not violate the Act because, although it deliberated in executive session and voted at the close of deliberations, the Board followed up with a written decision making public disclosure of how each

member voted. P & A contends that it is unclear whether the Act covers the Board but that if it does any violation may be cured by requiring a public vote, citing *Association of Community Organizations for Reform Now (ACORN) v. Southeastern Pennsylvania Transportation Authority (SEPTA)*, 789 A.2d 811 (Pa.Cmwlth. 2002).

The purpose of the Sunshine Act is to provide the Commonwealth's citizens with a right to be present at all meetings of public agencies and to witness deliberations, policy formulation and decision-making processes. *See* Section 702 of the Sunshine Act, 65 Pa.C.S. § 702. Section 704, 65 Pa.C.S. § 704, provides that "[o]fficial action and deliberations by a quorum of the members of an *agency* shall take place at a meeting open to the public unless closed under section 707 (relating to exceptions to open meetings), 708 (relating to executive sessions) or 712 (relating to General Assembly meetings covered)." An "agency" is defined in Section 703, *as amended*, 65 Pa.C.S. § 703, as:

> The body, and all committees thereof authorized by the body to take *official action* or render advice on matters of agency business, of all the following: ... any board, council, authority or commission of the Commonwealth or of any political subdivision of the Commonwealth ... or similar organizations created by or pursuant to a statute which declares in substance that the organization performs or has for its purpose the performance of an essential governmental function and through the joint action of its members exercises governmental authority and takes *official action.* (Emphasis added.)

■ The Board was created pursuant to Section 5-1005 of the Philadelphia Home Rule Charter, which provides in relevant part:

> The Board of License and Inspection Review *shall provide an appeal procedure* whereby any person aggrieved by the issuance, transfer, renewal, refusal, suspension, revocation or cancellation of any City license or by any notice, order or other action as a result of any City inspection, affecting him directly, shall upon request be furnished with a written statement of the reasons for the action taken and afforded a hearing thereon by the Board.... Upon such hearing the Board shall hear any evidence which the aggrieved party or the City may desire to offer, shall make findings and render a decision in writing. The Board may affirm, modify, reverse, vacate or revoke the action from which the appeal was taken to it. (Emphasis added.)

In *Appeal of Emmanuel Baptist Church,* 26 Pa.Cmwlth. 427, 364 A.2d 536 (1976), the Court held that a zoning hearing board created by the legislature and acting in a quasi-judicial capacity was an agency subject to the predecessor to the Sunshine Act. *See also Kennedy v. Upper Milford Township Zoning Hearing Board,* 575 Pa. 105, 131, 834 A.2d 1104, 1121 (2003) (stating that zoning hearing boards and zoning boards of adjustment are quasi-judicial bodies performing fact-finding and deliberative functions in a manner similar to a court and that "[t]he board may deliberate in private, but evidence must be received, and official action must be taken and announced in public session" (quoting Robert M. Anderson, American Law of Zoning § 22:25 (3d ed.1986))). Because the Board was created as a quasi-judicial body to perform fact-finding and deliberative functions, the Court holds that it is an agency as that term is defined under the Sunshine Act and correspondingly that it is subject to the Act's requirements.

Section 705 of the Sunshine Act provides that "[i]n all meetings of agencies,

the vote of each member who actually votes on any resolution, rule, order, regulation, ordinance or the setting of official policy must be publicly cast and, in the case of roll call votes, recorded." Section 713, 65 Pa.C.S. § 713, provides that "[s]hould the court determine that the meeting did not meet the requirements of this chapter, it may in its discretion find that any or all official action taken at the meeting shall be invalid."

Although the Court has determined that the Board is an agency subject to the Sunshine Act, it need not decide whether the trial court abused its discretion in refusing to invalidate the Board's decision and to remand for the Board to take a public vote. Deciding upon a remedy for violation of the Act is unnecessary in light of the remaining discussion and the Court's ultimate decision.

### III

The Association next contends that Section 5–1005 of the Home Rule Charter permits only "the aggrieved party or the City" to present evidence at a Board hearing and that because P & A was not aggrieved by the Commission's decision it lacked standing to intervene in the appeal. The City submits that intervention is simply a part of the appeal procedure that the Board was directed to devise and that it was within the Board's discretion to permit P & A to intervene to defend the Commission's decision. P & A states that its interest was not represented by the City at the Board hearing and that to deny P & A's participation in the hearing would violate its rights to due process and to protect its property interests.

An administrative body may exercise "[o]nly those powers within the legislative grant, either express or *necessarily implied.*" *Pennsylvania Human Relations Commission v. St. Joe Minerals Corp., Zinc Smelting Div.,* 476 Pa. 302, 310, 382 A.2d 731, 736 (1978) (emphasis added). In mandating the Board to provide an appeal procedure, Section 5–1005 of the Home Rule Charter does not prohibit intervention in an appeal to the Board. Intervention is "a procedural step by which a person not a party to an action is admitted or permitted to become a party to the action on his own application." *Bannard v. New York State Natural Gas Corp.,* 404 Pa. 269, 279, 172 A.2d 306, 312 (1961). Intervention is permitted "only where the party seeking it has an interest in or will be affected by the pending litigation." *Id.* Section 553 of the Local Agency Law, 2 Pa.C.S. § 553, provides that no adjudication of a local agency shall be valid as to any party unless the party was afforded reasonable notice of a hearing and opportunity to be heard.

As an owner and developer of the property, P & A had an interest in defending the Commission's decision permitting the proposed alteration of the façades of the York Row townhouses. Prohibiting P & A from participating in Board proceedings not only would contravene the general principle of intervention but also would result in depriving P & A of an opportunity to be heard as guaranteed by the Local Agency Law.[2] The Board's pow-

2. The Court rejects the assertion that P & A was *not entitled to intervene because its interest* was represented by the City. The City and P & A do not share the same interests. *See Larock v. Sugarloaf Township Zoning Hearing Board,* 740 A.2d 308 (Pa.Cmwlth.1999) (holding that trial court erred in denying residents intervention in appeal where the township did not share their interest in totally precluding a quarry). The Court likewise rejects the claim that P & A's right to be heard was satisfied because it could have presented evidence as

er to provide an appeal procedure necessarily implies its power to permit intervention by a party whose interests may be affected. Granting or denying intervention is within the sound discretion of the agency, and its decision will not be disturbed unless it abused its discretion. *West Chester Area School District v. Collegium Charter School,* 571 Pa. 503, 812 A.2d 1172 (2002). The Court finds no abuse of discretion by the Board in this regard.

## IV

To have standing, a party must demonstrate a substantial, direct and immediate interest in the outcome of litigation as opposed to a remote and speculative interest.[3] *North–Central Pennsylvania Trial Lawyers Ass'n v. Weaver,* 827 A.2d 550 (Pa.Cmwlth.2003). P & A maintains that the Association must assert a pecuniary interest or injury to its members and that neither the Association nor its members sustained an injury by the substitution of materials on the façades.

In *Pittsburgh Trust for Cultural Resources v. Zoning Board of Adjustment of Pittsburgh,* 145 Pa.Cmwlth. 503, 604 A.2d 298 (1992), the Court held that a trust and a community association with sixty dues-paying members had a substantial, direct and immediate interest in maintaining the integrity of the Penn–Liberty his-

toric district in Pittsburgh and in encouraging upscale commercial establishments, which would be adversely impacted by permitting an amusement arcade use in the district. Thus they had standing to appeal the grant of a variance. The Association here was created, *inter alia,* to promote "the improvement of the Society Hill area of Philadelphia ... and the preservation and restoration of its historic buildings." Association's By-laws; R.R. at 16a. It includes residents, businesses and other organizations who actively seek to protect historic buildings in the neighborhood, and it has over 900 dues-paying members. R.R. at 15a, 67a.

The Association and its members were directly involved in the subject of this litigation by negotiating with P & A for preservation of the façades of the York Row townhouses and expressing their concerns at various public meetings before the Architectural Committee and before the Commission. Because of its purpose to promote preservation and restoration of historic buildings in the Society Hill area, the Association has a substantial, direct and immediate interest in the outcome of this litigation. Clearly, the Association had standing to appeal.

## V

As for the merits, the Association argues that an unnecessary hardship exemption was not properly applied under

part of the City's case. *See Damico v. Zoning Board of Adjustment of City of Pittsburgh,* 164 Pa.Cmwlth. 394, 643 A.2d 156 (1994) (holding only that agency procedures afforded requisite notice and opportunity to be heard and that failure to make full use of that opportunity did not render procedures inadequate).

**3.** A substantial interest is one that surpasses the common interest of all citizens in procuring obedience to the law. *South Whitehall Township Police Serv. v. South Whitehall Township,* 521 Pa. 82, 555 A.2d 793 (1989).

A direct interest requires a showing that the matter complained of has caused harm to a party's interest, and an immediate interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it. *Id. See also Wm. Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975) (stating, *inter alia,* that landowner's aesthetic interest in preventing erection of an unsightly tower may confer standing).

the Preservation Ordinance, Section 14–2007 of the Philadelphia Code and the Commission's Regulations and that the Board's decision is not supported by substantial evidence. The Court's review is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether the necessary factual findings are supported by substantial evidence. *McDonald's Corp. v. Board of License & Inspection Review of City of Philadelphia,* 849 A.2d 1277 (Pa.Cmwlth.2004). Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (citing *Lewis v. Philadelphia Civil Service Commission,* 518 Pa. 170, 542 A.2d 519 (1988)). *See also Bethenergy Mines, Inc. v. Workmen's Compensation Appeal Board (Skirpan),* 531 Pa. 287, 612 A.2d 434 (1992). Appellate review must focus on whether rational support exists in the record, when viewed as a whole, for the decision reached. *Id.*

Section 14–2007(7)(k) of the Preservation Ordinance provides the following criteria to guide the Commission in deciding the propriety of proposed alterations, demolition or construction:

(.1) the purposes of this section;

(.2) the historical, architectural or aesthetic significance of the building, structure, site or object;

(.3) the effect of the proposed work on the building, structure, site or object and its appurtenances;

(.4) the compatibility of the proposed work with the character of the historic district or with the character of its site, including the effect of the proposed work on the neighboring structures, the surroundings and the streetscape; and,

(.5) the design of the proposed work[.]

(.6) in addition to the above, the Commission *may be guided in evaluating proposals for alteration or construction by the Secretary of the Interior's "Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings" or similar criteria.*

(.7) in specific cases as will not be contrary to the public interest, where, owing to special conditions, a literal enforcement of the provisions of this ordinance [section] would result in *unnecessary hardship* so that the spirit of this ordinance [section] shall be observed and substantial justice done, *subject to such terms and conditions as the Commission may decide,* the Commission shall by a majority vote grant an exemption from the requirements of this ordinance [section]. (Emphasis added.)

▪ Regulations 10.1, adopted by the Commission pursuant to the authority under Section 14–2007(4)(h) of the Preservation Ordinance, provides in relevant part:

The legislative history of this ordinance indicates that this provision [Section 14–2007(7)(k)(.7) ] was included *out of concern and consideration for low and moderate income persons.* This provision also recognizes that in such instances, the preservation of basic form and rhythm rather than restoration can meet the objectives of the ordinance and the Commission. (Emphasis added.)

In evaluating a request for the unnecessary hardship exemption, the Commission "may employ as its initial criterion the Section 8 Eligibility Guidelines established by the United States Department of Housing and Urban Development (H.U.D.) of not more than eighty percent (80%) of the median income for Philadelphia as defined by H.U.D." Regulations 10.2.a. The Commission is required to consider requests for exemptions made by persons who do not meet H.U.D. standards where a rigid application could result in unnecessary

hardship, such as "extraordinary medical or educational expenses, the cost of maintenance contrasted with the cost of alterations, and the financial ability of persons on fixed incomes. . . ." *Id.*

Before the Architectural Committee, P & A's architect, Mark Brodsky, stated that "fiberglass was chosen for replication, owing to cost factors." Minutes of the August 26, 2003 Architectural Committee Meeting; R.R. at 88a. Before the Commission, Shaw stated that it would cost $5000 to $6000 for replacement in fiberglass and $100,000 for replacement in marble and that he proposed to use fiberglass for economic reasons. P & A does not suggest that it might be considered a low or moderate income person or that it is subject to the special circumstances enumerated in Regulations 10.2.a. The record unequivocally shows that P & A did not prove eligibility for an unnecessary hardship exemption under the Regulations.

P & A similarly failed to satisfy Regulations 6.3.a, which provides that "[t]he Commission, its Architectural Committee and staff *shall* be guided in their evaluations by The Secretary of the Interior's Standards for the Treatment of Historic Properties with Guidelines for Preserving, Rehabilitating, Restoring & Reconstructing Historical Buildings (1995 ed.). . . ." (Emphasis added.) [4] P & A's engineer, Gianopulos, testified that the gutter in the old cornices was inadequate to handle the reflected rainfall off the façades of the building coming down the roof, that cornices made of fiberglass could get a bigger

trough to catch the runoff and that he recommended replacing the marble cornices with fiberglass because of safety concerns. Gianopulos stated that fiberglass can be a long-term material if it is properly "formulated, fabricated, installed and protected," but he conceded that there is an intrinsic value to an in-kind replacement of cornices with marble and that "a marble cornice could probably be configured to handle [the runoff]." N.T., pp. 40–41. The witness stated that the cornice was in two pieces and that the upper piece could not be made large enough in marble and that he was unaware of any environment impact studies or calculations of the quantity of water coming off of a forty-five-story tower. His involvement in the plan was "after the fact."

The Board did not reject the testimony of Lush and Steven Weixler, an Association member and an architect who specializes in residential restoration and rehabilitation with experience in historic preservation. Lush testified that the marble at the top of the building is part of the "vocabulary" of that building. N.T., p. 70. Weixler testified that replacement of the marble cornices in fiberglass would violate the Standards for Preservation Nos. 2 and 6 designed to prevent the introduction of modern materials into historic buildings except in four specific circumstances: unavailability of original materials; unavailability of craftsmen to perform the work; inherent flaw in the materials; and code changes due to

4. The contention of the City and P & A that evaluation of a proposed alteration under the Standards for Preservation is not mandatory is without merit. Section 14–2007(4)(h) specifically authorizes the Commission to adopt its own rules and regulations "as the Commission deems necessary for the conduct of its business." The Commission's Assistant Historic Preservation Officer, Randal Baron, acknowledged before the Board that Regulations 6.3.a mandates the Commission to be guided by the Standards for Preservation. *See also Brotman v. United States,* 111 F.Supp.2d 418 (S.D.N.Y.2000) (stating that the Standards for Preservation under 36 C.F.R. § 68.3 apply to all treatments, i.e., preservation, rehabilitation, restoration and reconstruction of National Register properties and that any treatment must be consistent with the historical character of the structure).

a dangerous nature of materials. Weixler stated that although Pennsylvania blue marble is no longer available white marble definitely is available, that craftsmen are available to reconstruct marble cornices and that the marble cornices on the façades of the York Row townhouses existed for 200 years with virtually no maintenance.

Notwithstanding the City's contention that the matter before the Commission and later before the Board did not involve hardship but simply an application to alter the façades by using fiberglass, the fact remains that the record does not contain substantial evidence to support the Board's decision to allow P & A to reconstruct the marble cornices with fiberglass. Despite the City's contention to the contrary, the trial court recognized that the Commission granted P & A an unnecessary hardship exemption, and upon review it is evident that no substantial evidence exists to support a conclusion that the cornices could not be reconstructed with marble without unnecessary hardship to P & A. *McDonald's Corp.*

In addition, the decision to allow reconstruction of the cornices with fiberglass was not in conformity with all applicable provisions of the Preservation Ordinance. Regulations 6.3.a mandates that the Commission shall be guided by the Standards for Preservation in evaluating proposed alterations of historic properties. No. 2 of the Standards for Preservation requires that the historic character of a property is to be "retained and preserved" and No. 6 requires that where repair or replacement of a distinctive feature is required, "the new material will match the old in composition, design, color and texture." 36 C.F.R. § 68.3(a)(2) and (6). Therefore, because of the errors committed in this matter, the Court shall reverse the order of the trial court affirming the decision of the

Board to allow P & A to reconstruct the marble cornices on the York Row townhouses with fiberglass.

### *ORDER*

AND NOW, this 27th day of July, 2006, the Court reverses the order of the Court of Common Pleas of Philadelphia County in the above-captioned matter.