**William ARMSTEAD and Tully J. Speaker and Barbara Krassenstein and Gail Ober and Annyah Hasler and Roger Hasler and Bernard Bondi and Roseanne Stagno Adams and Jovida Hill and Scenic Philadelphia, Appellants**

v.

**ZONING BOARD OF ADJUSTMENT OF the CITY OF PHILADELPHIA and City of Philadelphia and Franklin Institute.**

Commonwealth Court of Pennsylvania.

Argued Feb. 11, 2015.

Decided April 23, 2015.

Samuel C. Stretton, West Chester, for appellants.

Michael Sklaroff, Philadelphia, for appellee Franklin Institute.

BEFORE: DAN PELLEGRINI, President Judge, and BONNIE BRIGANCE LEADBETTER, Judge, and RENÉE COHN JUBELIRER, Judge, and ROBERT SIMPSON, Judge, and MARY HANNAH LEAVITT, Judge, and P. KEVIN BROBSON, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge RENÉE COHN JUBELIRER.

William Armstead, Tully J. Speaker, Barbara Krassenstein, Gail Ober, Annyah Hasler, Roger Hasler, Bernard Bondi, Roseanne Stagno Adams, Jovida Hill, and Scenic Philadelphia (collectively, "Objectors") appeal from the April 1, 2014 Order of the Court of Common Pleas of Philadelphia County (trial court) quashing, for lack of standing, Objectors' appeal from a Decision of the Philadelphia Zoning Board of Adjustment (ZBA). Objectors' appeal to the trial court challenged the ZBA's granting of a variance to permit the Franklin Institute (Applicant) to change the sign faces on Applicant's accessory, free standing sign located on its property at the corner of 20th Street and Winter Street (Property) from vinyl to digital. On appeal, Objectors argue that (1) the trial court erred in concluding they lack standing; and (2) the ZBA erred in granting the variance to Applicant. In contrast, Applicant argues it was entitled by right to modify its vinyl sign to digital and that the Philadelphia Department of Licenses and Inspections (L & I) erred in requiring it to obtain a variance. Because we agree that under current Supreme Court jurisprudence Objectors lack standing, we are constrained to affirm the Order of the trial court.

## I. BACKGROUND

Applicant initially applied, on July 16, 2012, to L & I "for a zoning/use registration permit for the proposed modification of an existing sign from vinyl to digital." (ZBA Decision, Findings of Fact (FOF) ¶ 1.) The existing sign at issue is accessory to Applicant's building and is located on its Property. (FOF ¶ 5–6.) The existing sign is double-sided, each sign face has approximate dimensions of 6 × 10 feet, and each sign face has an area of approximately 64 square feet. (ZBA Hr'g Tr. at 13, 36, R.R. at 68, 74.) Applicant sought to change the two faces of the sign from vinyl to digital. (FOF ¶ 7.) Under Applicant's plan, "there would be no change in height, size or orientation of the sign faces and no change in structure." (FOF ¶ 8 (quotation omitted).)

L & I determined that Applicant's plan to modify its existing sign was not permitted in the zoning district where the Property is located and is prohibited by the Benjamin Franklin Parkway Special Con-

trols set forth in the Philadelphia Zoning and Planning Code[1] (Zoning Code); therefore, L & I "issued a notice of refusal on July 21, 2012." (FOF ¶ 2.) In particular, L & I found that Applicant's sign conversion would result in a sign with "flashing and intermittent" illumination. (L & I Notice of Refusal, R. at Applicant Ex. 5.) Thereafter, Applicant appealed to the ZBA, requesting a variance for its proposed sign. (FOF ¶¶ 3–4.)

### a. Proceedings before the ZBA

On April 17, 2013, the ZBA conducted a hearing. (FOF ¶ 4.) At the ZBA hearing, Applicant stated that the existing sign is "'neither functional, nor reflective of the [Applicant's] mission.'" (FOF ¶ 9 (quoting ZBA Hr'g Tr. at 4, R.R. at 66).) Applicant explained that its "'mission is education[]'" and that the modification of the existing sign would allow it "'to present to the world a series of messages to showcase the wide range of educational programs offered within the building throughout the year.'" (FOF ¶ 10 (quoting ZBA Hr'g Tr. at 4, R.R. at 66).) Consequently, because with its existing sign Applicant could not disseminate its message to the public in order to accomplish its mission in the digital age, Applicant asserted that a hardship existed. (FOF ¶ 11.) In addition, Applicant argued that "'there is a hardship here, and the hardship is that this is an historic building, and we can't put signs on the roof' or 'throughout the campus.'" (FOF ¶ 12 (quoting ZBA Hr'g Tr. at 8, R.R. at 67).) Applicant submitted a letter to the ZBA setting forth five restrictions to which it would agree in order to obtain approval of the proposed sign, including: (1) reducing the sign's brightness; (2) equipping the sign with automatic dimming control, which adjust the sign's light levels to changing conditions; (3) extending the duration of each digital message to at least 20 seconds; (4) limiting the change time between messages to .25 seconds; and (5) prohibiting movement between messages. (FOF ¶ 13.)

Applicant presented Peter Saylor, an architect and planner, as an expert witness. (FOF ¶ 15.) Saylor testified that the existing sign had been on the Property for twenty years, was an appropriate size, would not change, and that "'only the face inside the existing structure'" would change. (FOF ¶ 15 (quoting ZBA Hr'g Tr. at 13, R.R. at 68).) Saylor also testified that the existing sign must be "'manually changed,'" requiring that the sign 'be taken down [and] pasted up, as opposed to electronically'" changing it. (FOF ¶ 16 (alteration added) (quoting ZBA Hr'g Tr. at 14, R.R. at 69).) When Saylor was asked if this represented a hardship he stated:

> "I would say that it is, only in the sense that they cannot achieve their mission to be able to showcase and educate the public about the programs, which is the purpose of their mission, and because we cannot add other signs to the property, given the historic nature of it and the limitations placed on that."

(FOF ¶ 17 (quoting ZBA Hr'g Tr. at 14, R.R. at 69).) Saylor also noted that the nearest residents to the existing sign live about 700 to 800 feet away, which he does not consider to be adjacent to the Property. (FOF ¶ 18.) Moreover, Saylor testified that, due to the physical surroundings of Applicant, "a literal enforcement of the [Zoning] Code would result in hardship in that 'because of the limitations of the historic site and building that they cannot, in fact, put more message[s] out to the pub-

---

1. The Zoning Code, as set forth in Title 14 of The Philadelphia Zoning and Planning Code, was repealed and reenacted effective August 22, 2012. Because this action commenced July 16, 2012, the previous version of the Zoning Ordinance governs this appeal.

lic.'" (FOF ¶ 19 (alterations added) (quoting ZBA Hr'g Tr. at 16, R.R. at 69).) Further, Saylor testified that he believed the conditions on which the appeal was based are unique to the Property and that granting the variance would not cause injury to any adjacent properties. (FOF ¶¶ 21–22.)

Additionally, Saylor testified that, in his opinion, granting the variance would not cause an increase in traffic congestion, impair the light or air adjacent to the proposed sign, or adversely affect transportation, public facilities, public health, safety, or welfare. (FOF ¶¶ 23–26.) Saylor also stated he believed that granting the variance "would be 'in harmony with the spirit of the [Zoning] Code.'" (FOF ¶ 27 (alteration added) (quoting ZBA Hr'g Tr. at 20, R.R. at 70).)

On cross-examination, Saylor testified that he was aware that the Benjamin Franklin Parkway (Parkway), the location of the Property, is an extremely difficult crossing for pedestrians. (FOF ¶ 32.) Further, Saylor testified that he had not seen performing models for the proposed sign, had not conducted environmental impact studies for the proposed sign, and had not done any studies examining the effect the proposed "sign might have 'in changing the nature of the Parkway at night.'" (FOF ¶¶ 34–36 (quoting ZBA Hr'g Tr. at 32, R.R. at 73).)

Applicant next presented Michael Tantala, an engineer and architect, to testify about his considerable experience with outdoor signage. (FOF ¶¶ 37–38.) Tantala testified that he prepared a report describing the proposed sign's conversion to digital, its appropriateness for the area, and its potential for posing a traffic or safety hazard. (FOF ¶ 39.) Tantala stated that the luminance of the proposed sign, time between messages, and duration of the messages would be strictly controlled; that the brightness of the proposed sign would adjust to changing light levels; and that there would be no movement within each message displayed on the proposed sign. (FOF ¶¶ 40–44.) Tantala also testified that the proposed sign did not raise any pedestrian or traffic safety concerns and that it specifically would not obstruct cars or pedestrians, block lines of sight, or detract from the effectiveness of traffic control devices. (FOF ¶¶ 45–46.) Moreover, Tantala stated that the proposed sign would be "'appropriate in height and size, based on industry standards, surrounding topography and professional design standards.'" (FOF ¶ 47 (quoting ZBA Hr'g Tr. at 41, R.R. at 75).)

On cross-examination Tantala denied, on three different occasions, that the proposed sign could be described as flashing or intermittent. (FOF ¶ 48.) Tantala also stated that he did not believe the proposed sign would "change the nature of the Parkway with regard to traffic or pedestrian safety concerns" and that he did not agree that the proposed sign would increase problems for pedestrians. (FOF ¶¶ 49, 51.) On cross-examination Tantala also testified that, in order to make his report, "he visited the site during day and night . . ., on foot and in a car, and also relied on the studies of others." (FOF ¶ 50.) Finally, Tantala stated that he believed the proposed sign would be a strictly controlled conversion and that any traffic or pedestrian issues in the area would be unrelated to the small sign. (FOF ¶ 52.)

Objectors presented eight witnesses, who all oppose the proposed "sign and believe it would change the nature of the Parkway and the signage in the Parkway." (FOF ¶ 53 (quotation omitted).) When the witnesses were asked on cross-examination, "whether they could see the [existing] sign from the windows of their homes, none of the witnesses . . . claimed to be

able to do so." (FOF ¶ 55.) When cross-examined, one witness also stated that the existing sign is not illuminated, but that "once it is, 'it will make all the difference in the world.'" (FOF ¶ 56 (quoting Hr'g Tr. at 69, R.R. at 82).) In support of their position, Objectors submitted a letter from City View Apartments and photographs of the area from different positions. (FOF ¶ 57.) Moreover, the ZBA received many letters and emails expressing opposition to the variance application. (FOF ¶ 59.)

The ZBA concluded that Applicant satisfied the Zoning Code's criteria for a variance and, thus, granted it a variance for the proposed sign. (ZBA Decision, Conclusions of Law (COL) ¶ 6.) In particular, the ZBA concluded that the record established the necessary hardship for granting a variance and that, without a variance, Applicant would be unable to adequately "deliver information regarding its programs … which are a core aspect of [its] mission." (COL ¶ 7.) The ZBA concluded that, because Applicant demonstrated "that it suffers from an unnecessary hardship which was not self-imposed and that relieving this hardship by grant of the requested variance would not adversely affect the public health, safety and welfare," it was proper to grant the variance. (COL ¶¶ 10–11.) The ZBA voted to approve the variance by a vote of four to one. (ZBA Decision at 8.)

**b. Proceedings before the trial court**

Objectors appealed the ZBA's granting of the variance to the trial court. Based on the Supreme Court decision in *Spahn v. Zoning Board of Adjustment,* 602 Pa. 83,

977 A.2d 1132 (2009), the trial court determined that Objectors lacked standing to appeal the ZBA's Decision. (Trial Ct. Op. at 4–5.) Specifically, the trial court concluded that most of the individual Objectors lack standing because they would be unable to see the proposed sign from their homes. (Trial Ct. Op. 4.) With regard to one of the individual Objectors, Jovida Hill, who would be able to see the illuminated proposed sign from her front stoop, the trial court concluded that she does not have standing to pursue the appeal because she did not establish that the proposed sign will have a "discernible adverse impact" on her or that it "will harm her interest or cause an injury." (Trial Ct. Op. at 5 (internal quotation marks omitted).) As for Scenic Philadelphia, the trial court concluded that although its purported mission may be laudable, "without more specific evidence of a direct, immediate and substantial adverse impact" it did not have standing, as an organization, to challenge the ZBA's Decision. (Trial Ct. Op. at 5.) Finally, without analysis or elaboration, the trial court briefly concluded that the ZBA did not abuse its discretion in granting Applicant a variance to change its existing sign from vinyl to digital. (Trial Ct. Op. at 6.) Accordingly, the trial court affirmed the ZBA's Decision. This appeal followed.

**II. DISCUSSION**

**a. Standing**

On appeal,[2] Objectors make several arguments regarding standing, including: (1) the nine individual Objectors are aggrieved by Applicant's proposed sign and, there-

---

**2.** Our review in a zoning case, where the trial court has taken no additional evidence, "is limited to determining whether the [ZBA] committed a manifest abuse of discretion or an error of law." *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637, 639 (1983). The ZBA will be found to have "abused its discretion only if its findings are not supported by substantial evidence[,] … mean[ing] such relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Id.* at 640.

fore, have established standing to challenge the ZBA's granting of the variance; (2) Scenic Philadelphia has standing based on its organizational purpose and the proximity of its members' residences to the proposed sign; and (3) Objectors have standing, as taxpayers, to challenge the proposed sign.

■ In order for an appellant to have standing to appeal a determination of the ZBA, they must demonstrate that they are an "aggrieved person." *Spahn*, 977 A.2d at 1149. For a party to be "aggrieved," the party must "show an interest that is substantial, direct, and immediate." *Id.* (citing *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269, 280 (1975)). For an interest to qualify as "substantial, there must be some discernible effect on some interest other than the abstract interest all citizens have in the outcome of [the] proceedings." *Id.* at 1151; *see also William Penn*, 346 A.2d at 280–81 (noting that "it is not sufficient for the person claiming to be 'aggrieved' to assert the common interest of all citizens in procuring obedience to the law"). *Id.* An interest is direct where the party demonstrates "some causation of harm to his interest." *Id.* In order for an interest to be considered "immediate, there must be a causal connection between the action complained of and the injury to the person challenging it." *Id.* Therefore, to meet the three requirements for an aggrieved party, the party must demonstrate that the challenged action personally harms his or her interest in a way that is greater than that of another citizen. *Id.* at 1151–52.

#### i. *Individual Objectors' standing*

■ The individual Objectors argue that they have standing because they use the park across from the proposed sign and walk in the area of the sign. Moreover, they argue they have standing because they all live within three blocks of the sign and at least two of the individual Objectors[3] would be able to see the proposed sign at night from their homes.

In *Spahn*, our Supreme Court consolidated three separate appeals from this Court involving, *inter alia*, standing in zoning cases and the constitutionality of Section 17.1 of the First Class City Home Rule Act[4] (Home Rule Act). *Spahn*, 977 A.2d at 1136. In the first case, appellant Spahn appealed the ZBA's granting of a dimensional variance of the Zoning Code's open area requirements. *Id.* In examining whether Spahn had standing to pursue the appeal, this Court considered the fact that "[he] lived approximately one and a half blocks from the subject properties" and that he "walked by the properties every day." *Id.* at 1138. This Court concluded that Spahn was not an aggrieved party because his "interest was no different from 'the interest common to all citizens regarding obedience to the law.'" *Id.* (quoting *Spahn v. Zoning Board of Adjustment*, 922 A.2d 24, 31 (Pa.Cmwlth.2007)). On appeal, the Supreme Court affirmed this

---

**3.** Although Objectors claim that two of the individual Objectors can see the sign from their homes, the record demonstrates that only one of the individual Objectors can actually see the sign from her home. (ZBA Hr'g Tr. at 67–68, R.R. at 82.)

**4.** Act of April 21, 1949, P.L. 665, *as amended*, added by Section 2 of the Act of November 30, 2004, P.L. 1523, 53 P.S. § 13131.1. Section 17.1 states:

> In addition to any aggrieved person, the governing body ... shall have standing to appeal any decision of a zoning hearing board or other board or commission ... As used in this section, the term "aggrieved person" does not include taxpayers of the city that are not detrimentally harmed by the decision of the zoning hearing board or other board or commission ...
> *Id.*

Court's decision, holding that because Spahn only made legal arguments against the variance and failed to establish he was "aggrieved," he lacked standing. *Id.* at 1152.

In the third consolidated case in *Spahn,* the Society Created to Reduce Urban Blight (hereinafter "SCRUB"),[5] several other organizations, and three individuals appealed the ZBA's granting of a variance to Keystone Outdoor Advertising to erect a 2,400 square foot billboard. *Id.* at 1139–40. Prior to reaching the Supreme Court, on appeal to this Court, the individuals argued they had standing because they lived in the general area of the billboard. *Society Created to Reduce Urban Blight (SCRUB) v. Zoning Hearing Board of Adjustment of City of Philadelphia,* 951 A.2d 398, 403–04 (Pa.Cmwlth.2008). We determined that "the distance between [a protesting individual's] property interest and the property subject to the challenged zoning decision can be critical because proximity of the properties may be sufficient to establish a perceivable adverse impact." *Id.* at 404. Moreover, we concluded that "an adjoining property owner, who testifies in opposition to a zoning application before the [ZBA], has sufficient interest in the adjudication to have standing to appeal the [ZBA's] decision to the trial court." *Id.* However, we also held that, "absent an assertion of a particular harm, standing has been denied to a protestant with no property interest in *the immediate vicinity.*" *Id.* (emphasis added). Therefore, because the closest individual lived 1.2 miles from the proposed billboard and the billboard was not visible from any of the

individuals' homes, we held that the billboard was "too far from where any of the three [i]ndividual [a]ppellants live[d] to have a direct or immediate effect on their interests." *Id.* On appeal, the Supreme Court reiterated our holding, concluding that because the individual Objectors lived over a mile from the proposed billboard, they could not establish that they had standing as aggrieved parties. *Spahn,* 977 A.2d at 1152.

In the instant case, in accordance with all the *Spahn* cases, the nine individual Objectors have not demonstrated that they are aggrieved by Applicant's proposed sign. First, although an objector may demonstrate standing based on the proximity of his or her residence to the subject property, none of the Objectors in this case are adjoining property owners or live in the immediate vicinity of the proposed sign. *SCRUB,* 951 A.2d at 404. Based on the record, the closest Objector lives one and a half blocks from the proposed sign,[6] (ZBA Hr'g Tr. at 61, R.R. at 80); however, under the *Spahn* cases, in which an objector lived within one and a half blocks of a property and did not have standing, an objector does not have standing merely because he or she lives within one and a half blocks of a property. *Spahn,* 977 A.2d at 1152. Thus, none of the Objectors have standing based solely on living in the immediate vicinity of the proposed sign.

■ Second, none of the individual Objectors have standing based on a "particular harm" resulting from the proposed sign. *SCRUB,* 951 A.2d at 404. At the ZBA hearing, none of the nine individual

---

**5.** SCRUB is Scenic Philadelphia's predecessor. The second consolidated case in *Spahn* also involved SCRUB; however, the sole issue on appeal to the Supreme Court in that case was the proper statutory construction of Section 17.1 of the Home Rule Act, 53 P.S. § 13131.1. *Spahn,* 977 A.2d at 1139.

**6.** The one and a half blocks constitutes a longer distance than most city blocks because Objectors' homes lie across the Parkway from the Property. (ZBA Hr'g Tr. at 69, R.R. at 82.)

Objectors testified that they will be able to see the proposed sign from the windows of their homes, and only one of the individual Objectors, Jovida Hill, testified that she will be able to see the proposed sign from the front stoop of her home. (FOF ¶ 55; Hr'g Tr. at 60–61, 67–69, R.R. at 80, 82.) Hill, who lives a block and a half from the proposed sign, stated that the illumination of the proposed sign "will make all the difference in the world." (FOF ¶ 56; Hr'g Tr. at 69, R.R. at 82.) However, Hill did not explain how illuminating the proposed sign would cause her injury or to what extent its illumination will affect her. Because Hill does not live within the immediate vicinity of the proposed sign and has not asserted any particular harm resulting from the proposed sign, she has not established standing, under *SCRUB*, to challenge the ZBA's decision. *SCRUB*, 951 A.2d at 404. As for the other eight individual Objectors, they also did not testify about how they would suffer a particular injury from the proposed sign. Although Objectors argue that the individual Objectors are aggrieved because they use the park across from the proposed sign and frequently walk by the Property, this interest is the same as the objector in *Spahn*, which the Supreme Court determined is "no different from the abstract interest" of all other citizens. *Spahn*, 977 A.2d at 1152. Thus, because the individual Objectors were unable to demonstrate an interest in the outcome of the proposed sign that was "substantial, direct and immediate," they are not aggrieved parties and do not have standing to pursue this appeal. *Id.* at 1149.

ii. *Scenic Philadelphia's standing*

■ Next, Scenic Philadelphia argues it has standing as an organization to challenge the ZBA's granting of the variance. Scenic Philadelphia's predecessor, SCRUB, is an organization that has been active since the 1980s in drafting billboard legislation and opposing illegal billboards. Because Scenic Philadelphia's mission is to improve the quality of life in Philadelphia and prevent illegal billboards, it maintains it has standing to challenge the ZBA's granting of the variance based on this Court's decisions in *Society Hill Civic Association v. Philadelphia Board of License & Inspection Review*, 905 A.2d 579 (Pa. Cmwlth.2006), and *Pittsburgh Trust for Cultural Resources v. Zoning Board of Adjustment of City of Pittsburgh*, 145 Pa. Cmwlth. 503, 604 A.2d 298 (1992). Scenic Philadelphia argues further that, because its members live within one to three blocks of the proposed sign, it has standing based on its members' proximity to the proposed sign.

In *Pittsburgh Trust*, both the Pittsburgh Cultural Trust (Trust) and Penn–Liberty Association (Penn–Liberty) contested the Pittsburgh ZBA's granting of a special exception and variances allowing the applicant to open an amusement arcade in the Penn–Liberty historic district of downtown Pittsburgh. *Pittsburgh Trust*, 604 A.2d at 300. The applicant challenged the standing of the Trust and Association. *Id.* at 301. In assessing whether the Trust had standing, this Court considered the fact that the Trust was headquartered at the Benedum Center in the Penn–Liberty historic district; had made "a substantial financial investment in the Penn–Liberty history district" and also had a "fundamental commitment [to] nurturing cultural activity in [the] area" of the proposed arcade. *Id.* at 304. Because the proposed arcade would be located within 200 feet of the Benedum Center, we concluded that the Trust was sufficiently aggrieved to have standing. *Id.* With regard to Penn–Liberty we determined that, for an association to have standing, "it must be alleged that at least one of the association's members

has or will suffer a direct, immediate and substantial injury to an interest as a result of the challenged action." *Id.* (quotation omitted). Because Penn–Liberty comprised approximately 60 dues-paying property owners in the Penn–Liberty area, who all had a "substantial, direct and immediate interest in maintaining the integrity of [the] historic district and in encouraging upscale commercial establishments that w[ould] be adversely impacted by an amusement arcade," we determined that Penn–Liberty also had standing. *Id.*

Similarly, in *Society Hill*, the Society Hill Civic Association (Society Hill) challenged L & I's decision to uphold a decision of the Philadelphia Historical Commission allowing a property owner "to reconstruct marble cornices with fiberglass on the facades of certain historically designated properties located in the Society Hill section of Philadelphia." *Society Hill*, 905 A.2d at 581. The property owner contended that Society Hill lacked standing. *Id.* at 585. Because Society Hill's purpose was to promote the preservation and restoration of historic buildings, included over 900 dues paying members dedicated to protecting historic buildings, and had actively negotiated with the property owner over the preservation of several townhouses, this Court concluded that Society Hill had standing to appeal. *Id.* at 586.

In *Spahn*, both this Court and our Supreme Court clarified our holdings from *Pittsburgh Trust* and *Society Hill*. In the third consolidated case in *Spahn*, SCRUB argued it had organizational standing based on *Society Hill* and *Pittsburgh Trust*. *Spahn*, 977 A.2d at 1150. On appeal to this Court, we held that "neither *Society Hill* ... nor *Pittsburgh Trust* stands for the proposition that a civic group must be granted standing in any zoning litigation involving the mission of

that group, no matter how remote the impact." *SCRUB*, 951 A.2d at 402. Because SCRUB "fail[ed] to show or allege any interest beyond the common interest of all citizens in procuring obedience to the law," we determined it lacked standing. *Id.* at 403.

On appeal from this Court's decision, our Supreme Court adopted the reasoning of this Court regarding SCRUB's failure to establish standing, determining that SCRUB's interest was no "greater than any other citizen of Philadelphia." *Spahn*, 977 A.2d at 1152. The Supreme Court determined, in addition, that although SCRUB's mission to enforce the Zoning Code, oppose "illegal billboards, and foster community development" was laudable, it was "no different from the abstract interest that all citizens have in the outcome of the proceedings." *Id.* In addition, the Supreme Court concluded that *Society Hill* and *Pittsburgh Trust* were factually distinguishable from SCRUB's situation. *Spahn*, 977 A.2d at 1152. Specifically, the Supreme Court noted that unlike *Society Hill*, where the organization was intimately involved in preservation negotiations and participated in public hearings, and *Pittsburgh Trust*, where the organization had made significant investments and whose offices were within 200 feet of the proposed arcade, SCRUB had not demonstrated that it was aggrieved. *Spahn*, 977 A.2d at 1152. With respect to whether SCRUB had standing based on its members' residences, the Supreme Court concluded that the members were not aggrieved because they did not live in the vicinity of the proposed billboard but, rather, lived over a mile away. *Id.*

Here, Scenic Philadelphia has not established that it has standing as an organization to oppose the ZBA's granting of a variance to Applicant. As our Supreme Court held in *Spahn*, Scenic Philadelphia

cannot establish standing simply by virtue of its organizational purpose. As laudable as Scenic Philadelphia's mission may be, this interest is no different than "the abstract interest that all citizens have" in ensuring obedience to zoning laws. *Spahn*, 977 A.2d at 1152; *SCRUB*, 951 A.2d at 402. Moreover, although Scenic Philadelphia relies on *Society Hill* and *Pittsburgh Trust* to argue that it has standing, as we noted in *SCRUB*, those cases do not stand for the proposition that organizations are granted standing whenever the mission of the organization is implicated. *SCRUB*, 951 A.2d at 402. Unlike *Society Hill*, Scenic Philadelphia has not been involved with negotiations with Applicant over the preservation of the Parkway. Further, in contrast to *Pittsburgh Trust*, Scenic Philadelphia has neither alleged that it has significant investments in the Parkway area nor presented evidence to demonstrate that its offices or members are located in the immediate vicinity of the proposed sign. Therefore, under *Spahn*, Scenic Philadelphia does not have standing arising from its organizational purpose to oppose illegal billboards.

In addition, although organizations such as Scenic Philadelphia can establish standing based on their members' own standing, *Pittsburgh Trust*, 604 A.2d at 304, in the instant case Scenic Philadelphia has not established that any of its members are aggrieved. Scenic Philadelphia's two members that testified at the hearing, Jovida Hill and Roseanne Stagno Adams, are also individual Objectors. (Hr'g Tr. at 59, R.R. at 80.) As discussed above, however, those individual Objectors did not establish that they have standing. Thus, because Scenic Philadelphia's members did not establish that they are aggrieved, Scenic Philadelphia does not have organizational standing based on its members' standing.

### iii. *Taxpayer standing*

■ Lastly, Objectors rely on *Rizzo v. City of Philadelphia*, 136 Pa.Cmwlth. 13, 582 A.2d 1128 (1990), and *Sprague v. Casey*, 520 Pa. 38, 550 A.2d 184 (1988), to contend that they have standing under a private attorney general theory. Objectors maintain they have a common interest, as taxpayers, in ensuring the legality of acts of the government, which gives them standing to challenge the ZBA's actions. Objectors argue that if they are denied standing there will be no one to oppose Applicant's "illegal billboard." (Objectors' Br. at 46.)

In *Sprague*, an election case, our Supreme Court concluded that taxpayers who are non-aggrieved may still have standing in instances where it is necessary to "enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement." *Sprague*, 550 A.2d at 187. Similarly, in *Rizzo*, a non-aggrieved taxpayer was deemed to have standing to challenge a decision of the Philadelphia Pension Board because the Board's decision would otherwise remain unchallenged. *Rizzo*, 582 A.2d at 1130.

*Sprague* and *Rizzo* are inapposite to the present case. Unlike those cases, where our courts created an exception to allow taxpayer standing, our General Assembly has clearly precluded the possibility of taxpayer appeals from ZBA decisions in Philadelphia. Section 17.1 of the Home Rule Act specifically states that, for the purpose of standing, " 'aggrieved person' does not include taxpayers of the city that are not detrimentally harmed by the decision of the zoning hearing board or other board or commission." 53 P.S. § 13131.1. Our Supreme Court, in *Spahn*, upheld the constitutionality of Section 17.1 and reasoned that "the plain language of [Section 17.1]

leads to the inescapable conclusion that the General Assembly intended to limit standing to appeal a zoning decision ... to two classes—the governing body *and* aggrieved persons—*while specifically excluding the broader category of taxpayers.*" *Spahn*, 977 A.2d at 1143 (second emphasis added). Because Section 17.1 of the Home Rule Act deliberately forecloses taxpayer appeals from ZBA decisions, Objectors are unable to establish standing under a private attorney general theory. Thus, Objectors have not established standing under any of their various arguments.[7]

Accordingly, for the foregoing reasons, the Order of the trial court is affirmed.

## *ORDER*

**NOW,** April 23, 2015, the Order of the Court of Common Pleas of Philadelphia County, entered in the above captioned matter, is **AFFIRMED.**

## CONCURRING OPINION BY President Judge DAN PELLEGRINI.

This case involves the grant of a variance from the provisions of the City of Philadelphia Zoning Code to permit Franklin Institute to change an existing passive two-face sign to a digital two-face sign with its message changing every 20 seconds. The sign, not large as signs go, is freestanding on the north side of the building facing Aviator Park which is part of the Benjamin Franklin Parkway, itself a part of the Fairmount Park system of Philadelphia. Residential properties are within 700–800 feet of the proposed sign.

The property is located in the Benjamin Franklin Parkway Special Controls District under the then-governing provisions of the Philadelphia Zoning and Planning Code[1] (Zoning Code) which prohibits flashing and intermittent signs. Aviator Park is located on the Benjamin Franklin Parkway adjacent to Franklin Institute, and Benjamin Franklin Parkway is part of Fairmount Park which serves as an open green space.

The majority finds that the individual Objectors do not have standing because none of them are adjoining property owners or live sufficiently close to the proposed sign or that they do not have standing based on a "particular harm" resulting from the proposed sign. It also finds that Scenic Philadelphia does not have standing because it cannot show or allege any interest beyond the common interest of all citizens in procuring obedience to the law.

I concur with the majority which affirms the trial court's dismissal for lack of standing only because this is an accessory use that does not have the intensity of modern digital billboards.

## I.

Fundamentally, the standing requirement in Pennsylvania "is to protect against improper plaintiffs." *In re Application of Biester*, 487 Pa. 438, 409 A.2d 848, 851 (1979). Juxtaposed against the federal standards, the test for standing in Pennsylvania is a flexible rule of law, perhaps because the lack of standing in Pennsylvania does not necessarily deprive the court

---

7. Because Objectors have not established standing to pursue their appeal, we do not reach the issue of whether the ZBA erred in granting the variance or whether L & I erred in requiring Applicant to seek a variance rather than allow it to modify its existing sign by right.

1. The Zoning Code, as set forth in Title 14 of The Philadelphia Zoning and Planning Code, was repealed and reenacted effective August 22, 2012. Because this action commenced on July 16, 2012, the previous version of the zoning ordinance governs this appeal.

of jurisdiction, whereas a lack of standing in the federal arena is directly correlated to the ability of the court to maintain jurisdiction over the action. *See Fumo v. City of Philadelphia,* 601 Pa. 322, 972 A.2d 487, 500 n. 5 (2009); *compare Jones Memorial Baptist Church v. Brackeen,* 416 Pa. 599, 207 A.2d 861 (1965), *with Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Also, in Pennsylvania there is a constitutional right of every person who finds it necessary or desirable to resort to the courts for protection of legally recognized interests to have justice administered without sale, denial or delay. Pa. Const. Art. 1, § 11; *Masloff v. Port Authority of Allegheny County,* 531 Pa. 416, 613 A.2d 1186 (1992). Pennsylvania courts are much more expansive in finding standing than their federal counterparts.

In *William Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269, 281 (1975), our Supreme Court held that a party has a legally recognized interest that gives standing to sue if he or she has a "substantial, direct, and immediate interest" in the subject matter of the litigation. Guided by much of our Supreme Court's discussion in *William Penn,* cases that followed have elaborated on what is needed to meet the substantial-direct-immediate test. The elements have been defined as follows:

> A "substantial" interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law. A "direct" interest requires a showing that the matter complained of caused harm to the party's interest. An "immediate" interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it, and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question.
>
> *South Whitehall Township Police Service v. South Whitehall Township,* 521 Pa. 82, 555 A.2d 793, 795 (1989) (citations omitted).

As applied to zoning cases, to establish standing, a property owner need not establish a pecuniary or financial loss if his or her property is located in close proximity to the subject property because the zoning decision is presumed to have an effect on the proximate property owner's property. *Spahn v. Zoning Board of Adjustment,* 602 Pa. 83, 977 A.2d 1132 (2009); *Appeal of Hoover,* 147 Pa.Cmwlth. 475, 608 A.2d 607 (1992); *Miller v. Upper Allen Township Zoning Hearing Board,* 112 Pa. Cmwlth. 274, 535 A.2d 1195 (1987); *Seeherman v. Wilkes–Barre City Zoning Hearing Board,* 42 Pa.Cmwlth. 175, 400 A.2d 1334 (1979).

Obviously, property that is adjacent to or abuts the zoning area in question is in close proximity for standing purposes. *See, e.g., Spahn; Hill v. Zoning Hearing Board of Chestnuthill Township,* 144 Pa. Cmwlth. 644, 601 A.2d 1362 (1992), *rev'd in part on other grounds,* 534 Pa. 45, 626 A.2d 510 (1993). We have also held that the owner of property that is within 400 to 600 feet of the challenged zoning district is also within close proximity and has standing. *See Appeal of Hoover.* However, the owners of property one-half mile and one mile or more away from the challenged zoning area have been deemed to not be in close proximity in order to confer standing on those challenging a change to the zoning ordinance or map. *Society Created to Reduce Urban Blight (SCRUB) v. Zoning Hearing Board of Adjustment of the City of Philadelphia,* 951 A.2d 398 (Pa.Cmwlth. 2008), *aff'd,* 602 Pa. 83, 977 A.2d 1132 (2009); *Appeal of Farmland Industries, Inc.,* 109 Pa.Cmwlth. 304, 531 A.2d 79

(1987), *appeal denied*, 517 Pa. 631, 539 A.2d 812 (1988). But where the use has been intensive and its effect emanates off the property, we have held that property owners who live well over a mile away have standing. *Grant v. Zoning Hearing Board of Township of Penn*, 776 A.2d 356 (Pa.Cmwlth.2001) (holding, in part, that landowners had standing by virtue of living within 6,600 feet of proposed electric generation facility).[2]

## II.

Municipalities as well as state and federal governments have regulated signs and billboards because they are seen from the street and can "distract drivers," constitute "traffic hazards," and can be "perceived as an esthetic harm" to the area. *Spriggs v. South Strabane Township Zoning Hearing Board*, 786 A.2d 333, 336 (Pa.Cmwlth.2001), *appeal denied*, 568 Pa. 730, 797 A.2d 919 (2002), citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 509–10, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); *Norate Corp. v. Zoning Board of Adjustment of Upper Moreland Township*, 417 Pa. 397, 207 A.2d 890 (1965). "If [a] city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems that they create is to prohibit them." *Metromedia, Inc.*, 453 U.S. at 508, 101 S.Ct. 2882. Traditionally, because signs were static and pretty much the same, they were regulated in zoning ordinances as to where their placement

would be, the appropriate size and nature of the sign structure and sign face, and to prevent billboard "farms" along the road. However, because they are considered a traffic hazard, other police power-type ordinances not related to the sign-board structure itself can be regulated outside the zoning ordinance if they cause harms on the public right-of-way much as liquor establishments or concert venues are subject to regulation caused by other public safety concerns even though allowed by zoning.

Although driver safety has been the primary reason given for the regulation of billboards, visual blight and intrusiveness are also concerns. The term "visual blight" has been applied to outdoor signs of all types since *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), in which the Supreme Court upheld a sign ban challenged on First Amendment grounds, noting that "[h]ere, the substantive evil—visual blight—is not merely a possible byproduct of the activity, but is created by the medium of expression itself."

When *Taxpayers for Vincent* was decided, digital billboards did not exist and the potential for visual blight is now much greater because they are much more intensive and have far greater effects than static billboards. The digital technology features two major changes from the old "static" signage, which is graphics-painted or printed on a surface to one which is much more intrusive to a neighborhood.

---

**2.** Scenic Philadelphia would have standing if one of its members has standing. Under Pennsylvania law, an association has standing as representative of its members to bring a cause of action even in the absence of injury to itself, if the association alleges that at least one of its members is suffering immediate or threatened injury as a result of the action challenged. *Pennsylvania Medical Society v.*

*Department of Public Welfare*, 614 Pa. 574, 39 A.3d 267, 278 (2012); *accord South Whitehall Township Police Service v. South Whitehall Township*, 521 Pa. 82, 555 A.2d 793, 797 (1989) (holding that a collective bargaining agent has standing to sue if members are aggrieved, even if the action is not related solely to collective bargaining).

The image on the digital sign is displayed by a myriad of colored "lightbulbs" (light-emitting diodes, or LEDs). So while the static sign is visible from daylight reflecting off of it or by artificial lighting at night, the digital image shines out from the sign. Moreover, with e digital signs, the image is supplied to the sign by a computer; the image can be varied at will, which makes it nothing more than an enormous "television on a stick."

This technology also makes signs much brighter making them visible from far greater distances and much more distracting due to their brightness and because the messages are constantly changing, thereby directly affecting more people in different ways than the old static signs. Moreover, unlike static signs that bathed the billboards in light, the new billboards emanate light and bathe those in the vicinity with direct or indirect light. They are designed to grab our attention and hold it, just like a television or radio commercial or an ad in a magazine. The digital or electronic sign tries to hold our attention even longer by changing messages and pictures every few seconds by using a series of extremely bright and colorful images causing already distracted drivers another reason to take their eyes off the road. Moreover, unlike a television that may be turned off, the senses of those using public spaces are constantly assaulted by the brightness and movement of the signs, not to mention the "light trespass" that spills out onto neighboring properties, and all those who want to use a park or the streetscape and visual blight caused by the signs.

## III.

These two properties—intense surface brightness and motion—pose questions to safety and esthetics issues beyond those raised by the old static signs. It follows that digital signs cause more harm to more people that must be considered in our analysis as to who has standing to challenge their placement and operation.

Taking all of the foregoing into consideration, while I would find that Objectors would have standing to challenge the placement of a non-accessory billboard, the sign in this case is an accessory one and it is not as bright and as intrusive as the large advertising billboards. Also, there is no testimony that this particular sign will add to or cause general visual blight or visual trespass causing harm to the neighborhood or any user of the park or that it will substantially interfere with the use of the park in the same manner as permitting a variance to allow a sign along a roadway that will distract drivers thereby potentially endangering those driving down the roadways or causing visual blight.[3]

An argument can be made that Objectors and Scenic Philadelphia have standing similar to the type of standing that our Supreme Court enunciated in *Consumer*

---

**3.** Also I would hold that the individual objectors are within the "zone of protection" recognized by the present Philadelphia Zoning Ordinance. Section 14–303(7) provides that:
(a) Signs may be illuminated, but the illumination shall be focused upon the sign itself, so as to prevent glare upon the surrounding areas.
(b) Flashing signs, signs with intermittent illumination, or signs with mechanically or electronically changing messages shall not be erected within 500 ft. of any Residential

district, nor face any Residential district within 1,000 ft. of the sign.
I would hold that any person that is within a residential district subject to those setbacks has standing because a legislative determination has been made that they will be harmed if a digital sign is placed within those distances. Other "zones of protection" can be created if the zoning ordinance imposes specific requirements that serve to protect a certain district from distinct harms and that person is within the ambit of that protection.

*Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 507 A.2d 323, 329 (1986), *overruled on other grounds, Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275, 877 A.2d 383, 408 (2005), which gives a party standing if the governmental action would otherwise go unchallenged; those directly and immediately affected by the complained-of expenditures are beneficially affected and not inclined to challenge the action; judicial relief is appropriate; redress through other channels is unavailable; and no other persons are better situated to assert the claim.

Courts will allow that type of standing because it serves the public in general to have the laws enforced. It is tempting to find standing on that basis given the apparent "looseness" in enforcement of sign regulation and the acknowledgement by Franklin Institute that no one has standing to challenge this particular sign or, for that matter, any sign that it obtains approval to put on its property. Standing under *Consumer Party* attempts to mitigate the disillusionment caused by the lax enforcement of sign regulations through the liberal grant of variances and the perception that what elected officials have decided is not followed and that elections do not make a difference. Having said all that, I have to resist that temptation to address that argument because it was not squarely raised.

Accordingly, I concur in the result reached by the majority.

DISSENTING OPINION BY Judge BONNIE BRIGANCE LEADBETTER.

The Benjamin Franklin Parkway is no ordinary street. It is an artistic monument like the cultural institutions that line it, enjoyed not only by Philadelphians, but by visitors from all over the world. For this reason, and for the reasons stated in President Judge Pellegrini's thoughtful concurring opinion, I would allow standing to citizens of the City, not because they are taxpayers, but because they are the intended beneficiaries of this beautiful civic treasure and they would truly be aggrieved if it were to be spoiled. There is no doubt that the well-reasoned majority has accurately applied the existing law. Nonetheless, I would carve out an exception for this unique property, and so must respectfully dissent.

Judge P. KEVIN BROBSON joins in this dissenting opinion.